## UNITED STATES ET AL. *v.* NEW YORK TELEPHONE CO.

No. 55.  Argued November 13, 14, 1945.—Decided January 28, 1946.

*Mr. Harry M. Plotkin,* with whom *Solicitor General McGrath, Messrs. Rosel H. Hyde, Harold J. Cohen, Max Goldman* and *Joseph M. Kittner* were on the brief, for appellants.

*Mr. Henry J. Friendly,* with whom *Messrs. Ralph W. Brown, Stephen H. Fletcher, Alan J. McBean* and *John B. King* were on the brief, for appellee.

*Messrs. Philip Halpern* and *Frank C. Bowers* filed a brief on behalf of the Public Service Commission of the State of New York, as *amicus curiae,* urging reversal.

MR. JUSTICE RUTLEDGE delivered the opinion of the Court.

This case presents new questions of "original cost" accounting, which arise from an order of the Federal Com-

munications Commission requiring readjustments in appellee's accounts. A detailed statement of the facts is necessary to an understanding of the issues. But the short effect of the controversy is that the Commission has required the appellee, New York Telephone Company, to make charges of some $4,166,000 to surplus, with corresponding credits to other accounts; the ultimate effect being substantially to compel the elimination of so-called write-ups from the company's accounts in order to bring them, to this extent, into conformity with the Commission's Uniform System of Accounts, which is based upon "original cost." The attacked entries were made in 1925, 1926, 1927 and 1928, prior to enactment of the Federal Communications Act, upon acquisition by appellee of business and property from its affiliate, American Telephone and Telegraph Company. The case embodies a rather long delayed chapter of the broad controversy presented in *American Telephone & Telegraph Co.* v. *United States,* 299 U. S. 232, to be discussed later.

For preliminary purposes it is enough to say that the appellee questions the Commission's power to make the order in issue and a District Court, composed of three judges, has permanently enjoined its execution. 56 F. Supp. 932. From that judgment this appeal has followed.

We turn to the facts before undertaking to state the issues more precisely. Appellee, the New York Telephone Company, is a subsidiary of the American Telephone and Telegraph Company, which owns all its common stock. Since its incorporation in 1896 appellee has engaged in the business of furnishing intrastate and interstate telephone service to the public in the states of New York and Connecticut. Prior to 1925, for historical reasons, American also had furnished intrastate toll service between certain points in New York State; but in that year, as part of its plan to withdraw from all such business, Ameri-

can transferred its intrastate toll business in New York State to the appellee.

In connection with this transaction occurred the four transfers of property, the accounting for which now concerns us. In November, 1925, September, 1926, and December, 1928, appellee purchased from American certain toll plant consisting of property such as poles, crossarms, guys and anchors, aerial wire and cable, underground cable, loading coils, conduit, and right of way. This property was needed to handle the additional intrastate business which had been transferred to it. Much of the property so acquired was in the form of an additional interest in toll plant which, prior to these transfers, had been jointly owned by American and New York.

The fourth sale took place in 1927. Before that time American had retained ownership of three essential parts, collectively called "the instruments"—the transmitter, receiver and induction coil—of the telephone stations used by subscribers. American had furnished and maintained these instruments under a contract between it and New York under which New York paid it a specified percentage of its gross revenues. In December, 1927, American sold to New York the instruments then in the service or supplies of New York.

None of these transfers of property changed the physical character of the plant or the service rendered to the public. The sole effects were to shift certain operating costs of American and certain fixed charges and taxes connected with the ownership of the property to New York and to eliminate New York's obligation to make payments to American for use of "the instruments"; for the rest, as the New York Public Service Commission described the transfer, it was "a bookkeeping transaction, with no change in ultimate ownership, in location, or in use of the

. . . property, but reflecting only a revised business relationship between affiliated corporations." [1]

American and New York agreed that the purchase price of the toll plant was to be an amount equal to its "structural value." As defined by the Uniform System of Accounts for Telephone Companies (Instruction 13) of the Interstate Commerce Commission, this was "the estimated cost of replacement or reproduction less deterioration to the then existing conditions through wear and tear, obsolescence, and inadequacy." A field inspection and an appraisal of the property were made by engineers, and appellee paid to American a total of $5,973,441.47 for the toll plant. The purchase price of the instruments transferred in 1927 was $6,661,238.91. This was based on the average price charged American by the Western Electric Company, the manufacturer and also a subsidiary of American, during the first nine months of 1927, less a twenty per cent allowance to reflect the then existing condition of the instruments.

The tables set out in the margin show the accounting treatment of these transfers at the time they occurred.[2]

---

[1] Opinion of the New York Public Service Commission, Case 9436, adopted December 14, 1943, 1 Report of the Public Service Commission (1943) 569, 571.

[2]

| Property group | Book cost to American | Related depreciation and amortization reserves | Net book cost of American | Recorded book cost to New York | Excess or "profit" to American |
|---|---|---|---|---|---|
| 1925—Toll line property | $5,010,340.19 | $801,858.95 | $4,208,481.24 | $5,831,884.78 | $1,623,403.54 |
| 1926—Toll line property | 95,924.66 | 14,449.20 | 81,475.46 | 97,310.39 | 15,834.93 |
| 1928—Toll line property | 28,077.64 | 4,144.78 | 23,932.86 | 44,246.30 | 20,313.44 |
| 1927—Telephone instruments | 8,135,224.98 | 3,980,944.73 | 4,154,280.25 | 6,661,238.91 | 2,506,958.66 |
| Total | 13,269,567.47 | 4,801,397.66 | 8,468,169.81 | 12,634,680.38 | 4,166,510.57 |

As the tables disclose, the "profit" to American, that is, the difference between the net book cost to it and the record book cost to New York, was $4,166,510.57. This amount American credited to surplus accounts as profit on the transactions.

This "profit," of course, arises from the fact that New York in making its accounting entries ignored the original cost to American and the depreciation which had accrued on the books of American up to the time of transfer, and entered solely the actual price paid by it for the properties. It did not, so to speak, "fold in" the net book cost to American.

Having set down these properties on its books at the price it paid to the parent corporation for them, New York then applied what it calls the "group method" of depreciation.[8] Under this method special depreciation rates were not applied to the property in question, despite the fact that it had a relatively short remaining life. Instead the current depreciation rates applicable to similar classes of plant were applied as long as the property remained in service. As portions of the property were retired, they were written out of the plant account at the amounts at which they had been recorded therein, that is, at the structural value; and debits of corresponding amounts, less allowance for salvage, were charged concurrently to the depreciation or amortization reserve.

---

[8] The Federal Communications Commission defines " 'Group plan,' as applied to depreciation accounting" as "the plan under which depreciation charges are accrued upon the basis of the original cost . . . of all property included in each depreciable plant account, using the average service life thereof properly weighted, and upon the retirement of any depreciable property its full service value is charged to the depreciation reserve whether or not the particular item has attained the average service life." 47 Code Fed. Reg. 31.01–3 (p).

On January 1, 1937, the Uniform System of Accounts of the Federal Communications Commission [4] for Class A and Class B telephone companies became effective [5] and

---

[4] The Communications Act of 1934 (48 Stat. 1064) provides:

"Sec. 220 (a). The Commission may, in its discretion, prescribe the forms of any and all accounts, records, and memoranda to be kept by carriers subject to this Act, including the accounts, records, and memoranda of the movement of traffic, as well as of the receipts and expenditures of moneys."

"Sec. 220 (c). The Commission shall at all times have access to and the right of inspection and examination of all accounts, records, and memoranda, including all documents, papers, and correspondence now or hereafter existing, and kept or required to be kept by such carriers, and the provisions of this section respecting the preservation and destruction of books, papers, and documents shall apply thereto. The burden of proof to justify every accounting entry questioned by the Commission shall be on the person making, authorizing, or requiring such entry and the Commission may suspend a charge or credit pending submission of proof by such person. . . ."

"Sec. 220 (g). After the Commission has prescribed the forms and manner of keeping of accounts, records, and memoranda to be kept by any person as herein provided, it shall be unlawful for such person to keep any other accounts, records, or memoranda than those so prescribed or such as may be approved by the Commission or to keep the accounts in any other manner than that prescribed or approved by the Commission. Notice of alterations by the Commission in the required manner or form of keeping accounts shall be given to such persons by the Commission at least six months before the same are to take effect."

Prior to passage of the Communications Act the power to prescribe accounts for telephone companies had been lodged with the Interstate Commerce Commission. Interstate Commerce Act § 20 (5), 41 Stat. 493, subsequently amended, 54 Stat. 917. See *American Telephone & Telegraph Co.* v. *United States*, 299 U. S. 232, 235–236.

[5] The order of the Federal Communications Commission prescribing a uniform system of accounts for telephone companies having average annual operating revenues exceeding $50,000, was adopted on June 19, 1935, 1 F. C. C. 45, and was originally to be effective January 1, 1936. This order was stayed because of the proceeding in the *American Telephone & Telegraph Co.* case, *supra* note 4, and did not become effective, as amended, until January 1, 1937. 3 F. C. C. 9.

applicable to New York. Under this system telephone companies were obliged to establish or reclassify their investment accounts on the basis of "original cost." [6]

In reclassifying its accounts as of January 1, 1937, New York estimated the amounts attributable to the surviving toll plant received from American, which it originally had included in its books on the basis of structural value. New York then determined the difference between those estimates and what it estimated was the original cost of such surviving plant to American. The difference was placed in Account 100.4, Telephone Plant Acquisition Adjustment. Account 100.4 includes amounts "representing the difference between (1) the amount of money actually paid (or the current money value of any consideration other than money exchanged) for telephone plant acquired, plus preliminary expenses incurred in connection with the acquisition; and (2) the original cost of such plant, governmental franchises and similar rights acquired, less the amounts of reserve requirements for depreciation and amortization of the property acquired." [7]

In 1938 New York began amortizing this sum by charges and credits to its operating expense Account 614, Amortization of Telephone Plant Acquisition Adjustment, with concurrent entries to Account 172, Amortization Reserve. As portions of the acquired plant were retired, amounts in

---

[6] The Rules and Regulations of the Federal Communications Commission provide that " 'Original cost' or 'Cost,' as applied to telephone plant, franchise, patent rights, and right-of-way, means the actual money cost of (or the current money value of any consideration other than money exchanged for) property at the time when it was first dedicated to the public use, whether by the accounting company or by predecessors." 47 Code Fed. Reg. 31.01–3 (x).

[7] At the same time appellee transferred from its Account 171, Depreciation Reserve, to its Account 172, Amortization Reserve, an amount which, when supplemented by future accruals over the estimated remaining life of the plant at the then current depreciation rates, would provide a reserve equivalent to the amount in question in Account 100.4 at the termination of the life of the property involved.

Account 100.4 were written out of that account and concurrent entries were made in Account 172.

On June 16, 1942, the Federal Communications Commission instituted the present proceeding by ordering a general investigation into the accounting performed by appellee at the time of and subsequent to the four transfers of property involved in this suit. The order required New York to show cause why $4,166,510.57 (the difference between book cost to American, less related depreciation, and the structural value of the property as recorded on the books of New York) should not be charged to its Account 413, Miscellaneous Debits to Surplus, with concurrent entries to such accounts as might be appropriate. The order also suspended all charges to operating expense accounts made by New York on or after January 1, 1943, for the purpose of or in conjunction with amortizing or otherwise disposing of amounts included in Account 100.4, pending submission of proof by respondent of the propriety and reasonableness of such charges.[8]

A joint hearing was then held with the New York Public Service Commission, and in June, 1943, the Federal Communications Commission issued its proposed report. After oral argument before the Commission sitting en banc, a final report and order were issued on December 14, 1943. 52 P. U. R. (N. S.) 101. The order directed New York to charge $4,166,510.57 to its Account 413, Miscellaneous Debits to Surplus, and to make appropriate concurrent entries to other accounts.[9]

---

[8] The Commission's order was grounded upon the provisions of § 220 (c) of the Communications Act. See note 4.

[9] On the same date the New York Public Service Commission also adopted its final report and reached the same conclusion. See note 1. We are informed by a brief *amicus curiae* filed by the New York Public Service Commission that "a proceeding for the review of the order of the New York Commission has been brought in the Appellate Division of the Supreme Court of the State of New York but the argument thereof has been deferred, pending the decision by this Court in the present case."

New York then brought this suit before a district court of three judges to enjoin the Commission's order.[10] Appellants' motion for summary judgment was denied and on January 2, 1945, as has been said, the District Court entered its judgment permanently enjoining the order. 56 F. Supp. 932. The court held that the accounting entries were legal when made, since they were in accordance with the accounting system then prescribed by the Interstate Commerce Commission; and that, consequently, the Commission could "not apply retroactively a new system to write down the plaintiff's surplus." The court also held that the Commission's order was contrary to this Court's decision in *American Telephone & Telegraph Co.* v. *United States,* 299 U. S. 232, and to a "stipulation" filed in that cause by the Solicitor General. The present appeal followed.

Appellee's first argument in support of the District Court's decision is a simple one. It is, shortly, that the Commission's order was premised upon the conclusion that the original accounting entries were illegal when made. Appellee disputes this, maintaining that the accounting entries made prior to January 1, 1937, were in full accordance with the system of accounts prescribed by the Interstate Commerce Commission. That system, by the argument, was based not upon original cost but upon actual cost "without distinction between acquisitions from affiliated companies and acquisitions from others than affiliates." [11]

The answer to this contention is equally simple. It is not necessary to decide whether the accounting entries,

---

[10] Section 402 (a) of the Communications Act makes applicable to orders of the Federal Communications Commission, with certain exceptions, the Urgent Deficiencies Act. 38 Stat. 219, 220.

[11] The District Court apparently accepted this argument, for it said: "The order under review proceeds upon the theory that plaintiff's accounting in question was improper when made and should be corrected." 56 F. Supp. at 938.

when made, were legal under the system promulgated by the Interstate Commerce Commission; for we think the order in review was not based exclusively upon that premise. It is true that language in the Commission's report, when read out of context, might be taken to lend support to appellee's position. But the report, read as a whole, shows that the Commission's order for the readjustment of the accounts went on the view that the inflation was not justifiable in the light of its own original cost system of accounts. The Commission may have thought, as an alternative ground for its decision, that the accounts were illegal when made; [12] but the principal foundation of the order was that appellee was legally subject to the requirement of restating its accounts on the basis of original cost; [13] and consequently any excess on its books over American's net book cost must be eliminated.

We turn therefore to New York's further argument, which begins with a concession. The brief admits that the Commission "could require *the balances remaining* in appellee's property accounts to be reclassified." (Emphasis added.) But it is urged that the Commission properly can go no further. Since portions of the property have been retired and written out of the plant account at

---

[12] Cf. Opinion of the Public Service Commission of New York holding, in part, that the Interstate Commerce Commission accounting requirements did not oblige New York "to write up the book value of system property or to inflate surplus by intra-system profits. But the adroit companies found it a convenient excuse for inflating book values." 1 Report of the Public Service Commission (1943) 569, 587.

[13] See *American Telephone & Telegraph Co.* v. *United States*, 299 U. S. 232, 242: "We are not impressed by the argument that the classification is to be viewed as arbitrary because the fate of any item, its ultimate disposition, remains in some degree uncertain until the Commission has given particular directions with reference thereto. By being included in the adjustment account, it is classified as provisionally a true investment, subject to be taken out of that account and given a different character if investigation by the Commission shows it to be deserving of that treatment."

the amount at which they were recorded originally and since corresponding charges have been made concurrently to the depreciation reserve,[14] appellee says the Commission is without power, perhaps under the terms of the Communications Act, but at any rate under its own system of accounts, to order a reclassification of the entries for plant which has now been retired.

The Government answers that the effect of the write-up caused originally by New York's recording the property at structural value rather than at American's net book cost has never been eradicated. It points to the fact that New York did not apply a special depreciation rate to the property in question although it was not new and its price purported to reflect existing depreciation. Thus, the Government in effect asserts that there has been an under-depreciation.[15] New York denies this. It says that the group method,[16] under which the property was depreciated at rates similar to those applying to like property, takes into account the fact that some property may remain in service for a shorter time than is expected and that some property may remain serviceable for a long time. Under the group method, it insists, such inequalities are averaged out in the rate fixed for the group as a whole.

The effect of appellee's argument would be to render the Commission powerless to write off much of the inflation caused by the original accounting in this case. For, as has been pointed out, the inflation is not "removed as property is retired. . . . When property is retired its

---

[14] See text at note 3.

[15] The brief *amicus curiae* of the New York Public Service Commission states: "A write-up or inflation of the book cost may be brought about either by an inflation of the book cost figure on the asset side or by a reduction of the related depreciation figure on the liability side.

"In this case, the inflation was accomplished principally by an understatement of the related depreciation."

[16] See text at note 3.

cost is credited to the proper asset account and (neglecting the effect of salvage) the same cost is debited to depreciation reserve, and the resultant change in book value is zero. Thus the effect of retiring an inflationary asset item is to create a deficiency in depreciation reserve equal to the inflation formerly existing in the asset account." [17]

Moreover, it would seem clear that rates established under the group method of depreciation are not properly applied to property purchased which is *known* not to have as long an expected serviceable life as property of the same sort purchased when new. It is true that testimony appears in the record that at the time of the purchase of the property "the question of the effect of this purchase on the depreciation rates, and whether or not the depreciation rates should be increased [so as] to allow for the fact that the property purchased was not new and, therefore, had less than the full life remaining" arose and was considered. True also, testimony showed it was decided at the time "that without any increase in the rates the rates that were already in effect would be ample to provide for retirement of the property purchased." Nevertheless the Commission apparently found that such was not the case.

We cannot say that such a conclusion was erroneous.[18] And it may be added, in support of the Commission's de-

[17] Opinion of the New York Public Service Commission, 1 Report of the Public Service Commission (1943) 569, 590.

[18] The Commission stated: "New York attempted to counter these conclusions with the contention that its depreciation reserve *as a whole* is now in excess of requirements and consequently the inflation introduced through the accounting for the transactions in question has been offset by an excess in the reserve resulting from other causes; and that, further, unless the Commission can show that the reserve as a whole is deficient no correcting entry which would increase the reserve can be required. But the question as to whether the depreciation reserve, taken as a whole, is adequate is irrelevant to the issues herein. No challenge is here being made to the adequacy of the depreciation reserve *as a whole*. This line of argument represents an attempt to offset one error by another. If New York's de-

sire to put New York's accounts on an original cost basis, that one of the effects of original cost accounting will be not to require New York in the future to do what it should have done in the past, at least under the Federal Communications Commission system of accounts. ". . . The depreciation rate [under original cost accounting] applicable to a specific class of plant can be based on an estimate of total service life. There is no necessity to depreciate part of the account (constructed plant) on a total service-life basis and another part (acquired properties) on a remainder-life basis." [19]

Appellee further urges that so much of the Commission's order as affects property already retired is improper, because the sole purpose of original cost accounting is to show separately the amount by which the price paid by the accounting company for property now in service exceeded the original cost of that property. But the purposes of an original cost system of accounting are broader. Under such a system the inflation in accounts not only may be segregated but may also be written off.[20] *North-*

---

preciation reserve is in excess of requirements, it means that New York has been making excessive charges to operating expenses for depreciation." 52 P. U. R. (N. S.) 101, 116–117.

It has been urged that, even if the Federal Communications Commission was correct in ordering the inflation in the accounts of New York written off the books, that inflation has been reduced by some fraction of the depreciation previously taken, that is, prior to elimination of the inflation, even though the group method of depreciation was employed. That point, whatever its merits, was not made until the case reached this Court. Accordingly we do not consider it.

[19] Colbert, Advantages of Original Cost Classification of Plant (1945) 35 Public Utilities Fortnightly 333, 343.

[20] For obvious reasons, the utility companies have not objected so much to the segregating of the difference between the cost to the accounting company of property acquired and original cost less depreciation as they have to removing this difference from the books. See Kripke, A Case Study in the Relationship of Law and Accounting: Uniform Accounts 100.5 and 107 (1944) 57 Harv. L. Rev. 433, 438 ff., especially at 445.

*western Electric Co.* v. *Federal Power Commission,* 321 U. S. 119, 123–124; *California Oregon Co.* v. *Federal Power Commission,* 150 F. 2d 25, 27–28.

The final question is whether the order falls within the decision in *American Telephone & Telegraph Co.* v. *United States,* 299 U. S. 232. That case involved an attempt to set aside an order of the Federal Communications Commission prescribing a uniform system of accounts for telephone companies. The companies objected to the order's "original cost" provisions as preventing them " 'from recording their actual investment in their accounts' with the result that the accounts do not fairly exhibit their financial situation to shareholders, investors, tax collectors and others." The Court replied that such a consequence would not be entailed, but that under the order only such an amount would be written off "as appears . . . to be a fictitious or paper increment." 299 U. S. at 240. However, to avoid possible misunderstanding and to give assurance to the companies, the Court requested the assistant attorney general appearing for the Government to reduce to writing his statement in that regard in behalf of the Commission. This he did, informing the Court that "the Federal Communications Commission construes the provisions of Telephone Division Order No. 7–C, issued June 19, 1935, pertaining to account 100.4" as meaning "that amounts included in account 100.4 that are deemed, after a fair consideration of all the circumstances, to represent an investment which the accounting company has made in assets of continuing value will be retained in that account until such assets cease to exist or are retired; and, in accordance with paragraph (C) of account 100.4, provision will be made for their amortization." This statement the Court accepted "as an administrative construction binding upon the Commission in its future dealings with the companies." The Court also noted that the case was to be distinguished from *New York Edison Co.* v. *Maltbie,* 244 App. Div. 685,

281 N. Y. S. 223, aff'd, 271 N. Y. 103, 2 N. E. 2d 277, "where under rules prescribed by the Public Service Commission of New York, there was an inflexible requirement that an account similar in some aspects to 100.4 be written off in its entirety out of surplus, whether the value there recorded was genuine or false."

The District Court thought the order in the instant case was erroneous "in view of the stipulation of these same defendants made in American T. & T. Co. v. United States, supra; certainly in the absence of proof that the excess of price over the seller's net book cost was not a 'true increment of value.' There has not been any determination based upon a fair consideration of all the circumstances in accordance with the stipulation mentioned, nor upon the evidentiary circumstances referred to in the opinion of the Supreme Court." 56 F. Supp. at 938.

We think this misconceives the "stipulation's" purport and effect. When the Federal Communications Commission finds, after full hearing and on evidence which sustains the finding, that part of the cost on the books of a company is due to a profit made by an affiliate or a parent at the time when the affiliate or parent has transferred property to it, the Commission has determined, "after a fair consideration of all the circumstances" in full compliance with the "stipulation's" reservation, that there has been no true investment but only a "fictitious or paper increment" within the meaning of the *American Telephone & Telegraph Company* case.[21] The stipulation did not

---

[21] All relevant facts pertaining to the transaction were before the Commission. The Commission found that there was no real increment of value to the assets as a result of the transfer and that the inclusion of any write-up would introduce "inflationary elements" into the plant accounts which in time would be "improperly reflected in the depreciation expense account as an alleged operating cost." No other findings were necessary. And the rejection by the Commission of the company's contention that reproduction cost less depreciation was the true criterion of "value" was plainly no error of law.

foreclose, rather it in terms reserved this inquiry. "For an intercorporate profit which upon a consolidated income statement of the affiliated group would disappear entirely is too lacking in substance to be treated as an actual cost." *Pennsylvania Power & Light Co.* v. *Federal Power Commission*, 139 F. 2d 445, 450. Indeed the opinion in the *American Telephone & Telegraph Company* case said: "There is widespread belief that transfers between affiliates or subsidiaries complicate the task of rate-making for regulatory commissions and impede the search for truth. Buyer and seller in such circumstances may not be dealing at arm's length, and the price agreed upon between them may be a poor criterion of value." 299 U. S. at 239.

It is argued, however, that the use of the word "may" was intended to put the burden on the Commission to find that in such inter-affiliate or parent-subsidiary transactions the price actually was a poor criterion of value. That is not our understanding. In the first place, the Act imposes upon the company, not on the Commission, the burden of proof to justify accounting entries. Neither the Court nor the Commission, in action taken with relation to the "stipulation," can be thought to have undertaken to shift this burden in the teeth of the statutory provision, as the full terms of the "stipulation," set forth below,[22] disclose. We think that the use of the condi-

---

[22] The entire statement (sometimes called "stipulation") of the Government in the *American Telephone & Telegraph Company* case (exhibit C in the instant case) reads as follows:

"The Federal Communications Commission construes the provisions of Telephone Division Order No. 7–C, issued June 19, 1935, pertaining to account 100.4, as follows:

"(1) That amounts included in account 100.4 that are deemed, after a fair consideration of all the circumstances, to represent an investment which the accounting company has made in assets of continuing value will be retained in that account until such assets cease to exist or are retired; and, in accordance with paragraph (C) of account 100.4, provision will be made for their amortization.

"(2) That when amounts included in account 100.4 are deemed, after a fair consideration of all the circumstances, to be definitely attributable to depreciable telephone plant, provision will be made

tional was meant to indicate no more than that this Court was not taking sides in the debate in accounting circles as to whether the price agreed upon between affiliates was or was not in fact a poor criterion of value. To resolve that discussion was and is for the regulatory commissions and not for the courts. We repeat that for a court to upset an accounting order it must be " 'so entirely at odds with fundamental principles of correct accounting' . . . as to be the expression of a whim rather than an exercise of judgment." 299 U. S. at 236–237. The order in this case is not of that character.[23]

The judgment is

*Reversed.*

MR. CHIEF JUSTICE STONE is of opinion that the judgment should be affirmed on the ground, as the court below held, that appellant, the Federal Communications Commission, is bound by and has not complied with the stipulation to which it was a party and which this Court approved in *American Tel. & Tel. Co.* v. *United States,* 299 U. S. 232, 240, 241. In that case it was contended that the Federal Communications Commission's uniform system of accounts for telephone companies would require that all amounts representing excess of purchase price paid by the telephone company to its parent company over the seller's original cost be written off.

The Court held that under that system, applied to the account here in question, which had been lawfully estab-

---

for amortization of such amounts through operating expenses, through the medium of either account 613 (R. 186) or account 675 (R. 205).

"The Commission believes that the foregoing construction of its order is that which it presented to the District Court through the affidavits of its witnesses."

[23] The Federal Power Commission, the Securities and Exchange Commission, and some state commissions (see the opinion of the New York Public Service Commission in the instant case) have taken the same position concerning interaffiliate transactions as has the Federal Communications Commission. See Kripke, A Case Study in the Relationship of Law and Accounting: Uniform Accounts 100.5 and 107 (1944) 57 Harv. L. Rev. 693, 705–708.

lished under Interstate Commerce Commission regulations, only such amount could be written off as appeared "to be a fictitious or paper increment," and not "a true increment of value." To avoid "the chance of misunderstanding and to give adequate assurance to the companies [including appellee here] as to the practice to be followed," the Court requested the Assistant Attorney General to reduce his statements to that effect to writing in behalf of the Commission. He did this and informed the Court "that 'the Federal Communications Commission construes the provisions of Telephone Division Order No. 7–C, issued June 19, 1935, pertaining to account 100.4' as meaning 'that amounts included in account 100.4 that are deemed, after a fair consideration of all the circumstances, to represent an investment which the accounting company has made in assets of continuing value will be retained in that account until such assets cease to exist or are retired; and, in accordance with paragraph (C) of account 100.4, provision will be made for their amortization.' "

Before the Commission could rightly direct that the assets in that account, which have not been retired, be written off, the stipulation required it to find, after a "fair consideration of all the circumstances," that the difference between the original cost and the price claimed to have been paid is not "a true increment of value." This the Commission has not done. In the face of its stipulation it may not assume, without a finding based upon evidence, that there is no "true increment of value" to the assets which appellee purchased over the cost to the seller, merely because appellee purchased the assets from its parent corporation.

The judgment should be affirmed.

MR. JUSTICE BLACK, MR. JUSTICE REED and MR. JUSTICE JACKSON took no part in the consideration or decision of this case.