**WISCONSIN–MICHIGAN POWER CO. et al. v. FEDERAL POWER COMMISSION (two cases).**

Nos. 10475, 10480.

United States Court of Appeals, Seventh Circuit.

June 9, 1952.

Martin R. Paulsen, Van B. Wake, John G. Quale, Milwaukee, Wis., for Wisconsin-Michigan Power Co., petitioner.

Bradford Ross, Howard E. Wahrenbrock, Attys., Federal Power Commission, Leonard Eesley and Sherman S. Poland, Washington, D. C., for respondent, Federal Power Commission.

Vernon W. Thomson, Atty. Gen. of Wisconsin, Stewart G. Honeck, Deputy Atty. Gen., William E. Torkelson, Chief Counsel, Public Service Commission of Wisconsin, Madison, Wis., for Intervenors State of Wisconsin and the Public Service Comm. of Wis.

Before KERNER, DUFFY and LINDLEY, Circuit Judges.

LINDLEY, Circuit Judge.

These are separate petitions, one by the State of Wisconsin and the Public Service Commission of Wisconsin in No. 10480 and the other by Wisconsin-Michigan Power Company in No. 10475, seeking review under Section 313(b) of the Federal Power Act, 16 U.S.C.A. § 825l(b), of an order of the Federal Power Commission of June 1, 1951 and a later one, overruling petitions for rehearing. Though the separate petitions do not rest upon exactly the same premises, the two appeals were argued together and we shall dispose of both in one opinion.

The Commission's order directed the power company to cease and desist from charging certain municipalities and other wholesale purchasers of electric energy for resale rates other than those on file with the Commission, unless and until such charges shall have been superseded by properly corrected new rates filed with and approved by the Commission, and to establish a reserve out of the earned surplus of the company to protect the purchasers against the over-charges.

The petitioners assert that, for the purposes of this litigation, the company is not a public utility within the intent of the Federal Power Act, 16 U.S.C.A. § 791a et seq.; that the Commission should have found that the sales were not made in interstate commerce within the meaning of the Act but that they constituted distribution from facilities used in local distribution; that the sales made to the municipalities were not at wholesale within the intent of the Act but were within the regulatory power of the Wisconsin Commission, in so far as Wisconsin sales are concerned, and that of the Michigan Commission, in so far as the sales in Michigan are involved, and that the requirement of creation of a contingent reserve is beyond the Commission's powers.

The facts are not largely in dispute. The power company operates two divisions, the northern and the southern. The northern includes, as its principal part, territory in the upper peninsula of Michigan adjoining Wisconsin and the southern, areas to the south entirely within Wisconsin. It operates four steam and hydro-electric plants in Wisconsin, eight in Michigan and a Diesel plant at Iron River, Michigan, all generating electric energy. The two divisions are inter-connected by a 132 K.V. line extending from the Michigan plants to a substation near Stiles, Wisconsin, and thence, with reduced voltage, south to Appleton, Wisconsin. The entire system is operated to produce, transmit, coordinate and distribute electric energy in such manner and in such volume as to insure continuity of service, maximum economic stability and adequate voltage throughout the two divisions in accord with the management's concept of efficient utility standards. Thus, when the Michigan plant's production falls short, it is supplemented by energy transmitted over the inter-connecting line from Wisconsin to Michigan and when the Wisconsin supply is inadequate, energy is transmitted from Michigan to Wisconsin to supplement the latter production. The percentage of the total distribution of each division supplied from without the state varies from time to time over the year, depending largely upon water conditions and partly upon other factors entering into the coordinated operation.

The examiner found that, of the energy distributed in Wisconsin, 17% is imported from Michigan and that the energy transmitted to Michigan from Wisconsin is 13% of the northern's total distribution. In certain seasons these percentages are very substantially increased and at other times, decreased. The essential fact in this respect is that, in this coordinated operation, electric energy is transmitted from Michigan to Wisconsin and from Wisconsin to Michigan in appreciable amounts by the power company and by it commingled with energy generated in the two respective districts and then delivered to the customers here involved. Before the energy reaches the wholesale purchasers, however, the voltage is stepped down by transformers in accord with general practice, in some instances, if not all, more than once. Obviously the energy thus transmitted in interstate commerce is not changed in form or in character except that the voltage is reduced to an extent consistent with efficient economic management and operation.

Shortly after passage of the Act in 1935, the power company asked for determination by the Commission of whether the then proposed merger of its interstate electric facilities and those of another company required Commission approval under Section 203 of the Act and, if so, that such approval be granted. Upon this application, the Commission held that the company is a public utility within the meaning of the Act and that, because of the transmission and sale in interstate commerce, all energy sold for resale is subject

to federal regulation, and granted the approval requested. This determination was never reviewed; in compliance with it, the company filed its rates covering sales to wholesalers, that is, sales for resales, except as to the Oconto Electric Cooperative, the rate for which was filed in 1947. From time to time, as other contracts of sale with wholesalers were made, rates were filed, and, when changes were made, supplements reflecting the amended rates were filed with the Commission.

Between January 11, 1949 and April 8 of the same year, the power company submitted certain amendments to its rate schedules which, in substance, effectuated an increase of something over 10% on the basis of its 1948 sales for resale. These amended rates were suspended by the Commission; whereupon, on May 27, 1949, the power company withdrew the proposed increased rates, saying that revised suggestions would be made as soon as they could be prepared. The Commission consented to the withdrawal. However, notwithstanding the suspension and withdrawal of the proposed increases, the company continued to bill the customers at the increased rates, beginning January 1, 1949, the invoices in each instance bearing a legend that the increase had been questioned and that if it should prove to be unjustified, the customer would be given an appropriate refund. This legend also included a recital that the Wisconsin Public Service Commission had approved the rates but that its regularity had been questioned by the Federal Power Commission and that each Commission claimed jurisdiction. At this stage, the Commission, on February 10, 1950, issued its order initiating a proceeding for determining the controverted question and set the matter for hearing. The power company resisted the order and the State of Wisconsin and the Wisconsin Public Service Commission intervened in support of this resistance.

Upon the facts which we have outlined to such extent as we believe essential, the contentions of the petitioners are based. They insist first that the company is not a public utility for the purpose of regulation under Section 205 but is such only for certain other purposes and that the sales are, therefore, not subject to the Commission's jurisdiction. This is part of the broader question involved, i. e., whether the sales involved are subject to regulation under 205 of the Act. Section 205(b) of the Act grants to the Commission jurisdiction to impose rates where the seller of electric energy is a public utility and the sales are "subject to the jurisdiction of the Commission" and Section 205(c) provides that every public utility shall file rates and charges for any transmission or sale subject to the jurisdiction of the Commission and that no change by any public utility in any such rate shall be made except after compliance with prescribed conditions. Section 201(e) defines a public utility as "any person who owns or operates facilities subject to the jurisdiction of the Commission." Subsection (b) provides that the Act shall apply to "the transmission of electric energy in interstate commerce and to the sale of electric energy at wholesale in interstate commerce" and that the Commission shall have jurisdiction over all facilities used in such transmission and sales.

We conceive of no ground upon which the power company, under these provisions, can be properly classed as other than as a public utility. Apparently the company recognized this when it originally applied to the Commission for interpretation, for, after the Commission had found and determined that the company was a public utility, it sought no judicial review. Nor did petitioners in their application for rehearing of the order here involved urge any such objection. This latter fact in itself should be conclusive, for Section 313(b) provides that no objection to an order of the Commission shall be considered by the court, unless it shall have been urged before the Commission in the petition for rehearing, unless there is reasonable ground for failure so to do. The petitioners' contention that the power company is not a public utility for the purpose of this litigation is, we think, without merit. Indeed, the reasoning underlying this contention is, as we have said, essentially merely a part of another ques-

tion, namely, whether the sales are subject to the jurisdiction of the Commission.

█ It is undisputed that electric current is generated in Michigan and transmitted to Wisconsin and generated in Wisconsin and transmitted to Michigan in interstate commerce. A company so transmitting energy from one state to another has been authoritatively held to be a public utility. Jersey Central P. & L. Co. v. F. P. C., 319 U.S. 61, 63 S.Ct. 953, 87 L.Ed. 1258; Connecticut L. & P. Co. v. F. P. C., 324 U.S. 515, 65 S.Ct. 749, 89 L.Ed. 1150. Inasmuch as the jurisdiction attaches when the transmission from one state to another and sales in interstate commerce occur and then only, it can not be denied that the subject matter is within the power of Congress to regulate interstate commerce. However, the State of Wisconsin denies that all its sales of electric energy in interstate commerce for resale are subject to federal jurisdiction. Yet that the states have no power to regulate sales made directly from interstate energy carried from state to state and delivered to wholesalers, that is, for resale, had been long established prior to passage of the Act. Missouri ex rel. Barrett v. Kansas Natural Gas Co., 265 U.S. 298, 44 S.Ct. 544, 68 L.Ed. 1027; P. U. C. v. Landon, 249 U.S. 236, 39 S.Ct. 268, 63 L.Ed. 577. It has been made equally clear that retail sales to consumers are local matters and that over them the states have complete jurisdiction. Thus the Supreme Court held in the earlier cases that the transportation of gas through pipe lines from one state to another is interstate commerce and that, as part of such commerce, it may be sold and delivered to local distributing companies free from interference by the state; that until the commodity transmitted in commerce reaches one for resale by him, the paramount interest is not local but national, admitting of and requiring uniformity of legislation.

In view of this absence of jurisdiction of the states in such situations, there was, prior to the enactment of the Federal Power Act, no regulation of a public utility, so far as its transmission and sales of electric energy at wholesale for resale were concerned. The states being without power and the federal government not having legislated in that respect, there was a no-man's land wherein operations by utility companies in such interstate operations were unregulated. The legislative history, House of Representatives 1318, 74th Cong., 1st Sess. pages 7, 8 and 27, discloses that the Congressional Committee intended that the provisions of the Act should apply to the transmission of electric energy in interstate commerce, i. e. the sale of energy at wholesale in interstate commerce, but not to the retail sale of any such energy in local distribution; that the Act left to the state the authority to fix local rates where the energy is brought in from other states, and that the rate making power of the Federal Power Commission was to be confined to those wholesale transmissions which the Supreme Court had held, in Public Utility Commission v. Attleboro Steam & Electric Co., 273 U.S. 83, 47 S.Ct. 294, 71 L. Ed. 549, to be beyond the reach of the state. Under that decision, said the committee, the rates charged in interstate commerce wholesale transactions could not be regulated by the states. It defined a wholesale transaction as the sale of electric energy for resale.

Since that time the courts have interpreted the Act in accord with this expressed intent of the Congress. Thus, in Illinois Natural Gas Co. v. Central Illinois P. S. Co., 314 U.S. 498, at page 508, 62 S.Ct. 384, at page 388, 86 L.Ed. 371, the court said: "We think it plain that these provisions, read in the light of the legislative history, were intended to bring under federal regulation wholesale distribution * * *. After the gas is brought into the state appellant makes the first sale to distributors for resale, to which the Act in terms applies." The statute "cut sharply and cleanly between sales for resale and direct sales for consumptive uses." Panhandle Eastern P. L. Co. v. P. S. C. of Indiana, 332 U.S. 507, 517, 68 S.Ct. 190, 195, 92 L.Ed. 128. "Congress occupied only a part of the field. As to sales, only the sale of gas in interstate commerce for resale was covered. Direct

sales for consumptive use were designed-ly left to state regulation." Panhandle Eastern P. L. Co. v. Michigan P. S. C., 341 U.S. 329, 334, 71 S.Ct. 777, 780, 95 L.Ed. 993. See also Colorado-Wyoming Gas Co. v. F. P. C., 324 U.S. 626, 65 S. Ct. 850, 89 L.Ed. 1235, and Jersey Central P. & L. Co. v. F. P. C., 319 U.S. 61, 63 S.Ct. 953, 87 L.Ed. 1258. We see no escape from the postulate that sales made by the power company to distributors for resale are subject only to federal regulation.

But, say petitioners, such sales are exempt from federal jurisdiction in view of the statutory exemptions of "other sales" and of "facilities used in local distribution." We think there is little solace for petitioners in these terms. Again the Congressional Committee reports impel our conclusion. See House Reports 1318, 74th Cong., 1st Sess. page 27. The committee outlined the reasons for its adoption of the language and made it clear, we think, that it was not employed for the purpose of broadening the exemptions claimed by the power company; it stated specifically that it had left the exemptions of local facilities the same as they were in the Senate bill.[1]

The distribution here made to wholesalers for resale was not made by facilities used in local distribution, that is, the facilities employed are not located at points on the system where local distribution starts and is carried on. As we have seen, it was the intent of the Congress to place in the Federal Commission jurisdiction which never belonged to the states, that is, sales from interstate commerce to wholesalers for resale. The question is essentially, when does interstate commerce transportation end and where do the local distribution facilities first become operative. We have seen that the power is transmitted from state to state. In the Wisconsin operation, it comes to Stiles in that state by means of the main transmission line from Michigan and there a transformer reduces it in voltage. It then proceeds in transmission over the lower voltage line to still other points where again the voltage is reduced; eventually it comes to the plants of the wholesalers. Thus the interstate transmission of electric energy continues from Michigan through the transformers in reduced voltage to the wholesaler; upon delivery to him local distribution begins when he resells. His sales and distribution at retail are clearly local in character, and constitute only local distribution; but at no point before delivery to him has been completed, has interstate transmission terminated. In other words, "facilities used in local distribution" means facilities used for making resale and distribution to consumers, jurisdiction over which is left to the states. It was only because of this conclusion that the Supreme Court said, in Panhandle Eastern P. L. Co. v. P. S. C. of Indiana, 332 U.S. 507, 517, 68 S.Ct. 190, 195, 92 L.Ed. 128, the Act "cut[s] sharply and cleanly between sales for resale and direct sales for consumptive uses." We think there is no ground for the position that local distribution includes any transmission occurring before the wholesaler who resells at retail is reached. F. P. C. v. East Ohio G. Co., 338 U.S. 464, 70 S. Ct. 266, 94 L.Ed. 268.

▆ Petitioners suggest that out-of-state energy sheds its interstate commerce garb when, after arrival in Wisconsin, it is continued in transmission, reduced from 132,000 volts to 33,000 volts and commingled with relatively larger quantities of Wisconsin generated energy. They seem to argue that the reduction in voltage is a change in "current" content. But current and energy are not the same. The former has to do only with intensity; the electric energy is ever the same. It is the same when it enters the transformer

---

1. It said "As in the Senate bill no jurisdiction is given over local distribution of electric energy, and the authority of the States to fix local rates is not disturbed even in those cases where the energy is brought in from another State. As in subsection (a), the provisions of the Senate bill relating to the production of electric energy for interstate transmission and facilities for such production are omitted."

as when it leaves, except for reduction in voltage. Its inherent nature is in no way altered; no new element enters it. Analogous are decisions that the purely mechanical act of reducing pressure under which gas is transported is not determinative of the question of jurisdiction. Illinois Natural Gas Co. v. Central Illinois P. S. Co., 314 U.S. 498, 509, 62 S.Ct. 384, 86 L.Ed. 371; Colorado-Wyoming G. Co. v. F. P. C., 324 U.S. 626, 65 S.Ct. 850, 89 L.Ed. 1235. We think the same reasoning applies to transmission of electric energy. Thus, in Hartford E. L. Co. v. F. P. C., 2 Cir., 131 F.2d 953, 960, certiorari denied 319 U.S. 741, 63 S.Ct. 1028, 87 L.Ed. 1698, the court said: "Nor is it of significance that the energy, in the course of transmission, passes through Connecticut Power Company's transformers where the voltage is changed; the nature of electric energy and of its transmission is such that we regard as inapposite cases * * * where shipments are interrupted for a considerable period during which the goods are processed." We agree with this reasoning.

As we understand petitioners' contentions, they insist that commingling, in Wisconsin, of Michigan generated energy with that generated in Wisconsin destroys the interstate character of the resulting mixture, so that all energy, after commingling takes place, is intrastate in character, having become part of the mass of goods within the state. But the reasoning of the courts quite generally is convincing that, even though the interstate component amounts to only a small percentage of the entire volume, the essential interstate character remains and sole jurisdiction is vested in the Commission. Pennsylvania W. & P. Co. v. F. P. C., D.C.Cir., 193 F.2d 230, affirmed 343 U.S. 414, 72 S.Ct. 843; Safe Harbor W. P. Corp. v. F. P. C., 3 Cir., 179 F.2d 179, 185, note 9, certiorari denied 339 U.S. 957, 70 S.Ct. 980, 94 L.Ed. 1368; Safe Harbor W. P. Corp. v. F. P.C., 3 Cir., 124 F.2d 800, 807, certiorari denied 316 U.S. 663, 62 S.Ct. 943, 86 L.Ed. 663; Jersey Central P. & L. Co. v. F. P. C. 319 U.S. 61, 66–67, 63 S.Ct. 953, 87 L. Ed. 1258; Connecticut L. & P. Co. v. F. P. C., 324 U.S. 515, 535–536, 65 S.Ct. 749,

89 L.Ed. 1150; Hartford E. L. Co. v. F. P. C., 2 Cir., 131 F.2d 953, 958, certiorari denied 319 U.S. 741, 63 S.Ct. 1028, 87 L.Ed. 1698; Missouri v. Kansas Natural Gas Co., 265 U.S. 298, 44 S.Ct. 544, 68 L.Ed. 1027; P. U. C. v. Landon, 249 U.S. 236, 39 S.Ct. 268, 63 L.Ed. 577; Kentucky N. G. Corp. v. P. S. C., D.C.E.D.Ky., 28 F.Supp. 509, affirmed 6 Cir., 119 F.2d 417.

The fact that the amount of out-of-state energy is small in proportion to the total amount of energy sold is unimportant. Connecticut L. & P. Co. v. F. P. C., 324 U.S. 515, 535, 536, 65 S.Ct. 749, 758, 89 L.Ed. 1150. There the court said: "It is contended that the volume of energy passing over certain of these facilities is insignificant in proportion to the total. * * * Congress appears to have left to the Commission's sound administrative discretion to determine whether or not to assert its authority in such situations. * * * We do not find that Congress had conditioned the jurisdiction of the Commission upon any particular volume or proportion of interstate energy involved, and we do not think it would be appropriate to supply such a jurisdictional limitation by construction."

Nor does the fact that Wisconsin generated energy is commingled with energy transmitted from Michigan convert the transaction to local or intrastate activity. As the Supreme Court said, in Railroad Commission of Wisconsin v. Chicago, B. & Q. R. R. Co., 257 U.S. 563, 588, 42 S.Ct. 232, 237, 66 L.Ed. 371: "Commerce is a unit and does not regard state lines, and while under the Constitution, interstate and intrastate commerce are ordinarily subject to regulation by different sovereignties, yet when they are so mingled together that the supreme authority, the Nation, cannot exercise complete effective control over interstate commerce without incidental regulation of intrastate commerce, such incidental regulation is not an invasion of state authority or a violation of the proviso." See also United States v. New York Central R. Co., 272 U.S. 457, 47 S.Ct. 130, 71 L.Ed. 350; Missouri v. Kansas Natural Gas Co., 265 U.S. 298, 44 S. Ct. 544, 68 L.Ed. 1027; Kentucky N. G.

Corp. v. P. S. Co., D.C., 28 F.Supp. 509, affirmed by adoption of opinion in 6 Cir., 119 F.2d 417. The cases cited by petitioners, Lone Star G. Co. v. Texas, 304 U.S. 224, 58 S.Ct. 883, 82 L.Ed. 1304 and State v. Flannelly, 96 Kan. 372, 152 P. 22, are readily distinguishable.

As to petitioners' attempted distinction between the Natural Gas Act and the Federal Power Act and their assertion of the inapplicability of decisions under the former to the latter, we agree ·with the language of the ninth circuit, in Federal Power Commission v. Arizona Edison Co., 9 Cir., 194 F.2d 679, 682 "* * * The key statutory language is almost identical; compare 'transportation of natural gas in interstate commerce' with 'transmission of electric energy in interstate commerce' and 'local distribution of natural gas or to the facilities used for such distribution', with 'facilities used in local distribution'."

■ Petitioners insist that sales to distributing municipalities are exempt from federal regulation. They argue that the definition of a "sale * * * at wholesale" as a "sale * * * to any person for resale," in Sec. 201(d) of Part II must be held, in view of the definition· of a person as excluding a municipality in Part I, Sec. 3(4), 3(3), 3(2), not to include municipalities. After consideration of the legislative history of the respective provisions of the Act, we think the apparent inconsistency was an oversight and that Congress never intended to exclude from its definition of sales for resale, sales to municipalities for resale. When we bear in mind the gradual development of the various provisions of the Act and the policy of the statute as a whole, we think that the "slip" was inadvertent and that we must so interpret the Act as to make effective its over-all purpose, despite the literal words of Part I. United States v. American Trucking Ass'n, 310 U.S. 534, 60 S.Ct. 1059, 84 L.Ed. 1345; United States v. Rosenblum Truck Lines, 315 U. S. 50, 62 S.Ct. 445, 86 L.Ed. 671. In doing so we look also to the continued construction of the Act by the Commission,—the agency charged with its administration. Norwegian Nitrogen Co. v. United States,

288 U.S. 294, 53 S.Ct. 350, 77 L.Ed. 796; United States v. American Trucking Assn., supra. The report of the Congressional Committee recommended no exemption of wholesales to municipalities, yet where an exemption was intended, the report so stated, House· Rep. No. 1318, 74th Cong., 1st Sess. p. 8. The House definition of wholesaler was obviously intended to broaden the Senate definition which it supplanted. All this reflects, we think, an intent not so to limit the word "person" as to exclude any one selling electric energy for resale.

To exempt municipal corporations would mean, as the Commission states in Otter-Tail P. Co., 2 F.P.C. 134, 137, 33 PUR NS 257, 260, that "a utility may not discriminate in rates charged private persons or corporations, but is at complete and unfettered liberty to indulge in the rankest discrimination as between municipalities, or as between private customers and municipalities, receiving the same service." We can not conceive that Congress intended to deprive consumers served by municipally owned distribution systems of the protection it was providing customers of other corporations against unjust and unreasonable rates. To construe the Act otherwise would fail to give effect to other provisions, such as Section 306, allowing municipalities to file complaints before the Commission on account "of anything done or omitted to ·be done" in contravention of the Act and Section 313(a), which authorized review of Commission orders at the behest of any aggrieved municipalities. We agree with the Commission's comment in Otter-Tail P. Co. v. F. P. C. supra, at 138: "Since the most serious, if not the only real complaint a municipality could have against a public utility would involve the rates charged it for electric energy at wholesale (the Commission has no power to regulate the retail rates of a public utility), it is most persuasive Congress intended. that we have jurisdiction over such wholesale rates."

The State of Wisconsin argues that, as the state has in fact regulated the rates involved, such regulation precludes the Commission's jurisdiction by reason of

480

Section 201(a), providing: "such Federal regulation [i. e., that which Congress thereby finds necessary in the public interest], however, to extend only to those matters which are not subject to regulation by the States." The short answer is that, as we have seen, these sales are within the area in which the states have been held by the Supreme Court to be constitutionally powerless. In other words, in view of the fact that the state has no constitutional power to regulate these rates, there is no basis for an argument that the Federal Commission is without power to step in and prevent state regulation.

We conclude that these sales for resale to the municipalities and to the wholesalers mentioned in the order were made in interstate commerce; that local distribution had not begun; that the interstate character of the transmission persisted until delivery to the wholesaler; that, up to that point, no local distributive facilities were in operation and that, therefore, the sales involved are, in pursuance of the Act, subject to regulation.

 The power company contends that the Commission erroneously found that excesses over the legal rates had been charged and that the Commission had no authority to direct the establishment of a contingent reserve to cover liability to make refunds for excesses. In view of our conclusion that the Commission has power to regulate these sales, its determination as to what the proper rates are and as to existence of liability for excesses, as well as the appropriate accounting treatment, from our examination of the record, is fully justified by the evidence. We can not say as a matter of law that the findings of the Commission in this respect are unsupported by substantial evidence. When in 1946, supplements to the rates on file for these sales disclosed to the Commission that the company had been charging rates lower than those provided in the filed rates, the Commission treated the company's letter of explanation as a supplement to the rate schedules and placed the rates on file. This relieved the company of any violation growing out of charging the lower rate,

Berwind-White Co. v. Chicago & Erie R. R., 235 U.S. 371, 35 S.Ct. 131, 59 L.Ed. 275, and constituted, we think, undisputed evidence that the company understood that its actions in this respect constituted part of its filed rates.

We think also that the provision for a reserve fund to protect wholesale purchasers was entirely justified, as an appropriate exercise of the Commission's accounting powers under Section 301 to carry out the provisions of Section 305(a), which prohibits declaration or payment of dividends out of capital, and well within the recognized power of regulatory commissions having similar powers of accounting control. American Power & Light Co. v. Securities and Exchange Commission, 1 Cir., 158 F.2d 771, 780, 781, certiorari denied 331 U.S. 827, 67 S.Ct. 1348, 91 L. Ed. 1842; American T. & T. v. United States, 299 U.S. 232; United States v. New York Tel. Co., 326 U.S. 638, 655, 66 S.Ct. 393, 90 L.Ed. 371.

Finding no error in the proceedings, the petitions for review are denied and the order is approved.