## PENNSYLVANIA POWER & LIGHT CO. v. FEDERAL POWER COMMISSION.

### No. 8107.

Circuit Court of Appeals, Third Circuit.

Argued April 21, 1943.

Decided Dec. 7, 1943.

Rehearing Denied Feb. 11, 1944.

John F. MacLane, of New York City (Richard Hawkins and Simpson Thacher & Bartlett, all of New York City, and Thomas J. Perkins, E. G. Hauff, and C. J. Green, all of Allentown, Pa., on the brief), for petitioner.

Howard E. Wahrenbrock, of Washington, D. C. (Charles V. Shannon, Gen. Counsel, Louis W. McKernan, F. R. Bell, and Frederic M. P. Pearse, Jr., all of Washington, D. C., on the brief), for respondent Federal Power Commission.

Before MARIS and GOODRICH, Circuit Judges, and BARD, District Judge.

MARIS, Circuit Judge.

The Pennsylvania Power & Light Company constructed the Wallenpaupack Power Project in Pennsylvania under license issued by the Federal Power Commission by authority of the Federal Water Power Act, 41 Stat. 1063. The project was begun in 1924 and completed in 1926. Pursuant to Section 4(a) of the Federal Water Power Act, 41 Stat. 1065, to Article 17 of the license and to Regulation 20, Section 2, of the Federal Power Commission's Rules and Regulations, the licensee filed with the Commission on October 24, 1928, its statement of actual legitimate original cost of the project to December 31, 1927, and subsequently filed annual statements of additions, betterments and retirements to December 31, 1934. In these statements the licensee claimed $9,148,755.88 as the total actual legitimate original cost of the project, additions and betterments.

By order of April 14, 1942, as amended September 29, 1942, the Commission determined the actual legitimate original cost of the Wallenpaupack project as of December 31, 1934, to be $8,579,186.15. The Commission arrived at this figure by disallowing a number of the items claimed by the licensee as cost. It directed the licensee to conform its books of account to reflect such determination. By the present petition filed under authority of Section 313(b) of the Federal Power Act,[1] 49 Stat. 860, 16 U.S.C.A. § 825*l*(b), the licensee seeks to have the order of the Commission set aside or modified so as to have included in the actual legitimate original cost of the project several of the items disallowed by the Commission and to eliminate from the Commission's order the direction that the disallowed items be written out of the licensee's capital accounts and transferred to its earned surplus. If it succeeds in having the order modified so as to have any or all of the disallowed items included in cost the licensee also seeks to have the interest during the construction period recomputed in accordance with such adjustment.

The items which were disallowed by the Commission and as to which the licensee seeks review were the following:

| | |
|---|---|
| Phoenix Utility Company construction fee | $197,596.35 |
| Electric Bond and Share Company engineering charges... | 93,629.87 |
| Accounting and hearing expenses | 28,118.41 |
| Flow Line Bands and Shoes... | 15,167.99 |

We shall discuss them in the order stated.

*Phoenix Utility Company Construction Fee*

Construction work upon the project was done by Phoenix Utility Company under a cost plus fixed fee contract. The fee of 3% amounting to $197,596.35 paid by the licensee to Phoenix under this contract was disallowed by the Commission because of the affiliation which existed between Phoenix and the licensee through Electric Bond and Share Company. In doing so the Commission applied its "no profit to affiliates" rule. The rule was stated in Louisville Hydro-Electric Company, 1 F.P.C.

[1] The Federal Water Power Act was largely amended and added to by Title II of the Act of Aug. 26, 1935, 49 Stat. 838, 16 U.S.C.A. §§ 791a–825r. Among the amendments effected by Sections 212 and 213 of the Act was the change of the short title of the Federal Water Power Act to "Federal Power Act"; 49 Stat. 847, 863, 16 U.S.C.A. § 791a.

448

130 (1933). In that case the Commission was called upon to determine actual legitimate original cost as that term was used in the Federal Water Power Act. The Commission there said (p. 136): "In making a determination of the actual legitimate original cost of the project constructed under this contract, the Commission is not blinded by legal technicalities nor misled by attenuated theories. Where there is admitted control of both the licensee and the service company and where, as here, the two companies are virtually departments of an integrated system, the Commission must, under the provisions of the Federal Water Power Act, disregard the contract and hold that cost to the licensee can be no more, though it may under certain circumstances be less, than the cost of such service to the service company. Since the relationship of these two companies so unmistakably points to the existence of a superimposed power arbitrarily to dictate contracts and fix charges for services, the Commission cannot be bound by the terms of such contract, but must demand evidence of the cost to the Byllesby Service Co. of the services rendered."

Congress was informed of this interpretation of the statutory phrase "actual legitimate original cost" by the Commission in its Fourteenth Annual Report transmitted December 1, 1934, in which the Commission said (p. 2): "* * * the Commission has sought to protect the public interest by denying claims of costs for services to the licensee, performed by holding companies or affiliated service corporations, pending production by the licensed operating company of the original records of cost. In considering such claims the Commission holds that 'cost to the licensee can be no more, though it may under certain circumstances be less, than the cost of such service to the service company.'"

In 1935 Congress made extensive amendments and additions to the Federal Water Power Act but retained without change the act's use of the phrase "actual legitimate original cost." [2] Immediately after the enactment of the 1935 amendments the Commission again applied its "no profit to affiliates" rule. Northern States Power Co., 1 F.P.C. 329, 344, 345 (1936).

The licensee urges that since Section 3 of the act states that "'net investment' in a project means the actual legitimate original cost thereof as defined and interpreted in the 'classification of investment in road and equipment of steam roads, issue of 1914, Interstate Commerce Commission'," the interpretation of the phrase "actual legitimate original cost" by the Interstate Commerce Commission is controlling. It urges further that the Interstate Commerce Commission has so interpreted the phrase as to allow profits paid by a carrier to an affiliated construction company to be included in cost without differentiating between them and payments made to non-affiliated contractors. The licensee relies primarily upon Texas Midland Railroad, 1918, 75 I.C.C. 1, 176, as authority for this proposition. The Commission cites, as authority for an opposite conclusion, Kansas City Southern Railway Company, 1919, 75 I.C.C. 223, 233.

Before considering these cases, however, we note that the Valuation Act of 1913, 37 Stat. 701, 49 U.S.C.A. § 19a, under which the "classification of investment in

---

[2] Section 3 of the Federal Water Power Act, 41 Stat. 1064, reads: "'Net investment' in a project means the actual legitimate original cost thereof as defined and interpreted in the 'classification of investment in road and equipment of steam roads, issue of 1914, Interstate Commerce Commission', plus similar costs of additions thereto and betterments thereof, minus the sum of the following items properly allocated thereto, if and to the extent that such items have been accumulated during the period of the license from earnings in excess of a fair return on such investment: (a) Unappropriated surplus, (b) aggregate credit balances of current depreciation accounts, and (c) aggregate appropriations of surplus or income held in amortization, sinking fund, or similar reserves, or expended for additions or betterments or used for the purposes for which such reserves were created. The term 'cost' shall include, insofar as applicable, the elements thereof prescribed in said classification, but shall not include expenditures from funds obtained through donations by States, municipalities, individuals, or others, and said classification of investment of the Interstate Commerce Commission shall insofar as applicable be published and promulgated as a part of the rules and regulations of the commission."

By Section 201 of the Act of Aug. 26, 1935, 49 Stat. 839, 16 U.S.C.A. § 796(13), the foregoing language of Section 3 was retained without change as paragraph (13) of amended Section 3.

road and equipment of steam roads" was issued in 1914 by the Interstate Commerce Commission pursuant to the mandate of the act to the Commission to investigate and report upon the "original cost", inter alia, of the physical property of the carriers subject to its jurisdiction, refers merely to "original cost" and does not use the qualifying adjectives "actual" and "legitimate." Likewise the classification itself does not use these adjectives as qualifying "original cost". Its purpose was to define and classify the elements entering into the cost of road and equipment and to prescribe the several general and primary accounts in which the costs thus defined and classified were to be entered. The only provisions of the classification touching our present problem are the following statements appearing in the general instructions: "*Costs* shall be actual money costs to the carrier." (p. 10). "The cost of construction shall include the cost of labor, materials and supplies, * * * contract work, * * * and other analogous elements in connection with such work." (p. 11). "*Cost of contract work* includes amounts paid for work performed under contract by other companies, firms, or individuals, and costs incident to the award of the contract." (p. 12). We find nothing either in the general instructions or in the body of the classification bearing upon the question whether work done by affiliated service or construction companies is to be deemed "work performed under contract by other companies" or whether the corporate forms are to be disregarded and the work is to be deemed to have been performed by the carrier itself acting through the instrumentality of its corporate affiliate.

Turning to the Interstate Commerce Commission's opinion in the Texas Midland Railroad case we find nothing therein which may fairly be construed as dealing with the question whether the Interstate Commerce Commission interpreted original cost so as to include profits paid by a carrier to an affiliated corporation. In that case the issue which the Interstate Commerce Commission was called upon to decide was whether in determining the cost of a project the amounts actually expended by the carrier or the fair average cost must prevail. It ruled in favor of the amounts actually expended. Nor is the case upon which the Federal Power Commission relies authority for its present contention. In Kansas City Southern Railway the carrier paid profits not only to independent subcontractors who did the actual construction but also to affiliated corporation contractors which had sublet the construction work to the independent subcontractors. The Interstate Commerce Commission allowed the profits paid to the independent subcontractors to be included in the cost. It disallowed the claim for profits paid to the carrier's affiliated corporations, not because of the affiliation but because they had not done the work and therefore were not entitled to any profits based upon construction work done.

We conclude that the "classification of investment in road and equipment of steam roads, issue of 1914, Interstate Commerce Commission", to which the Federal Water Power Act referred as defining and interpreting "actual legitimate original cost", did not determine whether profits paid by a carrier to an affiliated construction company were to be included in determining such cost and does not in fact throw any light upon the meaning intended by Congress to be given to the qualifying words "actual" and "legitimate" as used in the Federal Water Power Act, since these words did not appear in the statute under which the classification was issued. We further conclude that up to the time of the enactment of the Federal Water Power Act in 1920 the Interstate Commerce Commission had not ruled upon the question whether under the Valuation Act of 1913 and the classification issued in 1914 profits paid to an affiliated construction corporation by a carrier were includible in determining original cost of the road. The Interstate Commerce Commission cases decided after the passage of the Federal Water Power Act and cited [3] by the licensee have no bearing on the question before us since they could not have been in the contemplation of Congress when it passed the act and do not deal with the meaning of the statutory phrase with which we are concerned—"*actual legitimate* original cost". We must, therefore, determine whether the Federal Power Commission's "no profit to affiliates" rule is justified by the statutory direction that the original

---

[3] New York, Philadelphia & Norfolk R. Co., 1925, 97 I.C.C. 273, 275; Atlantic City & Shore R. Co., 1927, 125 I.C.C. 353; Southern Pacific Company, 1933, 45 I.C.C., Val.Rep., 1, 12; Pullman Company, 1936, 47 I.C.C., Val.Rep., 501.

cost which is to be determined must be "actual" and "legitimate".

██ We think that the Commission's "no profit to affiliates" rule is in accord with the statutory mandate that costs are to be restricted to actual expenditures and are not to be illegitimately inflated by any device. Had the licensee itself constructed the project one could hardly contend that it could charge as a part of the cost any profit to itself. Clarion River Power Company, 1 F.P.C. 269, 279 (1935). Such a charge would not be an actual or legitimate item of cost. But payment of profits to an affiliated corporation may·for all practical purposes be the equivalent of payment of profits to the licensee itself. In such a case the interposition of the corporate veil between what may be in fact, if not in law, mere departments of a single integrated system will not serve to legitimize what otherwise would be an illegitimate item of cost. For an intercorporate profit which upon a consolidated income statement of the affiliated group would disappear entirely is too lacking in substance to be treated as an actual cost. Our view in this respect is in accord with the rulings·in two recent cases.

In Alabama Power Co. v. McNinch, 1937, 68 App.D.C. 132, 94 F.2d 601, the profit fee was denied as an item of cost by the Commission because the construction corporation was found to be but a department of the licensee. Upon appeal the licensee contended, as does the licensee in this case, that the item must be allowed when reasonable as measured by amounts which would have been charged by others for· the performance of like services. The court answered this contention by saying (page 94 F.2d at 618): "The statute in insisting upon actual legitimate cost must be·taken to forbid inflation of cost by any device; and the finding that the Dixie Construction Company was a department of the licensee, since it is supported by substantial evidence, cannot be disturbed. If, as the Commission found, the Dixie Company was but the construction department of the Power Company, to allow a 3% fee on the costs of the 'Dixie Company' would be to allow 3% more than the actual cost to the Power Company of the work. Our conclusion is that the disallowance of the Dixie fee was correct."

The same power company, Alabama, and the same construction company, Dixie, were again involved in Alabama Power Co. v. Federal Power Commission, 5 Cir., 1943, 134 F.2d 602. However, whereas, Alabama had owned all the stock of Dixie during the construction period involved in the McNinch case, it had subsequently transferred that stock to a company which was wholly owned by the same holding company which owned Alabama's stock. The Circuit Court of Appeals for the Fifth Circuit held that the 3% fee paid by Alabama to Dixie was an intercorporate profit and not a cost of construction. The court said (page 134 F.2d at 609): "The purpose of the determination of original legitimate cost is to protect the public against. exaggerated claims by licensee utility companies of their investments in respect of which they are entitled to a return. Holding companies have much confused the matter. This is a situation in which the corporate fiction may be carefully scanned and separate corporate entities ignored when they are used to evade the law. So long as Alabama owned Dixie, there was no strain in holding it a mere department of Alabama. The matter is not much changed by the shift of stock ownership so that the same corporation owns them both. Legitimate costs cannot in either case be swelled beyond what they would have ,been if the construction had been done by the ultimate owner of the project. Legitimate cost includes everything spent that would have been rightly spent if there had been but one corporation, but not ,profits charged by one wholly owned ·corporation against another."

The facts of the present case justify the Commission's conclusion that a close relationship existed in the Electric Bond and Share holding company system among the licensee, Phoenix and Electric Bond and Share. Since the incorporation of Phoenix in 1906 as a construction company Electric Bond and Share has owned its total outstanding stock of 20 shares having a par value· of $100 each. Aside from its name Phoenix has no genuine corporate existence. It operates with no funds of its own, has no construction equipment, no officers or employees of its own but only such as are supplied by Electric Bond and Share or by the operating companies, and pays none of their salaries. It operates only within the Electric Bond and Share system and obtains none of its contracts as a result of competitive bidding.

From the date of its organization in 1920 to December 31, 1934, the date as of

which the cost of the project is to be determined, the entire common stock and the majority of the outstanding voting stock of the licensee was owned by Lehigh Power Securities Corporation, a subsidiary of Electric Bond and Share. While Electric Bond and Share owns but 15% of Lehigh's voting securities it possesses working control of Lehigh through voting trust agreements and service contracts.[4]

Phoenix and the licensee are thus both puppets in the Electric Bond and Share system. Moneys paid by the licensee to Phoenix at the behest of Electric Bond and Share and designated as a fee for construction work might without altering the essential nature of the transaction have been paid by the licensee directly to the corporation which pulled the strings, Electric Bond and Share. The Commission was amply justified in its conclusion that by reason of the control exercised by Electric Bond and Share over both Phoenix and the licensee and the intercorporate relationship there was no arm's length dealing in the arrangement whereby the licensee agreed to pay Phoenix a fee of 3% of the cost of constructing the project. The fee thus exacted by Electric Bond and Share for its corporate dummy was not a legitimate item of cost. We conclude that the Commission properly applied its "no profit to affiliates" rule and properly disallowed the licensee's claim of $197,596.35 paid to Phoenix as an item of actual legitimate original cost.

### Electric Bond and Share Company Engineering Charges

The engineering department of Electric Bond and Share provided the licensee with designs and specifications for the Wallenpaupack project under a contract whereby the licensee reimbursed Electric Bond and Share for the salaries paid to the employees of Electric Bond and Share who did the work and in addition paid a stated percentage to cover overhead. The overhead charged averaged approximately 95% of the salaries. The Commission determined that but 50% was properly allocable as overhead to the engineering and other services rendered on the project. It allowed as actual cost to Electric Bond and Share the salaries paid by it plus 50%

and disallowed the remaining 45% which amounted to $84,555.75.

Our discussion of the Phoenix fee is equally applicable to the Electric Bond and Share charges insofar as those charges represent profits to Electric Bond and Share. However the partial disallowance of these charges raises the additional question whether the Commission erroneously reduced the overhead charges from 95% to 50%. The Commission reached its conclusion because it found from an independent study that Electric Bond and Share in computing the overhead claimed for the engineering department had loaded that department with expenses of other departments without justification. The purport of the licensee's argument is that the findings of the Commission are contrary to the testimony of witnesses called on behalf of the licensee, to the conclusions reached by the licensee's accountants, Haskins & Sells, in their accounting report, and to a report of an examiner of the Federal Trade Commission which contained a study and audit of Electric Bond and Share's engineering overhead. However, the licensee does not contend that the Commission's findings are contrary to the facts as presented by Andrew W. Wilcox, who audited the Electric Bond and Share books for the Commission and of Charles W. Smith, the Commission's chief accountant.

The Commission's determination that the facts do not justify more than a 50% allocation of the total overhead of Electric Bond and Share to the engineering department was not reached arbitrarily and capriciously but only after an exhaustive study of the books and practices of Electric Bond and Share. Section 313(b) of the Federal Power Act provides that "the finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive." This court, therefore, may not disturb the determination of the Commission upon this question.

The Commission disallowed three items paid by the licensee to Electric Bond and Share as its proportionate share of engineering salaries and expenses incurred in making preliminary engineering investigations. The Commission disallowed the first two items because there was no evi-

---

[4] Corporate control is possible without ownership of a majority of the corporate stock. Deleware & Hud. Co. v. Albany & Susquehanna, 1909, 213 U.S. 435, 452, 29 S.Ct. 540, 53 L.Ed. 862; United States v. Union Pacific R. R. Co., 1912, 226 U.S. 61, 95, 96, 33 S.Ct. 162, 57 L.Ed. 306.

dence that the work related to the Wallenpaupack site or project and also because there was no evidence as to how the charges were allocated. The licensee claims that there is testimony of one witness that as a result of the investigation which cost $10,812.81 and for which the licensee paid as its proportionate share $3,536.26 Wallenpaupack was recommended for development and acquired from the syndicate controlling it. We have examined that testimony and find that it relates to an investigation ordered by the licensee and does not by its terms refer to the investigation ordered by Electric Bond and Share for which the charges were paid. It, therefore, cannot be held as a matter of law that there was evidence to connect the salaries and expenses incurred for the investigation for which the charges were made with the site actually developed.

The second item for preliminary engineering studies is for $2,000 which was allocated as the licensee's share of a total of $12,336 paid by Electric Bond and Share as salaries and expenses. The licensee rests its claim upon the plea that since these expenses were incurred prior to 1921 and before construction of the Wallenpaupack project it is impossible to determine the accuracy of the allocation at this late date. The necessary voucher support was not submitted and although the reason for the failure to do so is understandable we cannot hold that the Commission erred in disallowing this item.

The third item is for $313.73. Before the commencement of active construction of the project the licensee gave a work order for an engineering study designed to obtain a greater water supply for the Wallenpaupack reservoir. The study had been estimated to cost $3,000 but was abandoned after but a small percentage of the work contemplated had been done. That work had no effect upon the project, either positive or negative, because not enough was accomplished to have any meaning. We conclude that the Commission properly disallowed the three items claimed for preliminary engineering investigations.

## Accounting and Hearing Expenses

▮ In conformity with Section 4(a) of the Federal Water Power Act[5] the licensee prepared and submitted its claim of original cost of the project together with supporting evidence. The cost of doing so was $28,118.41. This item was also claimed as cost. The Commission disallowed this item, we think properly. The cost was incurred after completion of the project. It was incurred in connection with the formal proceedings before the Commission. As such the item is properly classified as an operating expense rather than a construction cost. The fact that the expenditures were made pursuant to the license which had incorporated the statutory requirement that the licensee should provide the Commission with an original cost claim, does not alter the character of the expenditures as operating expenses.

## Flow Line Bands and Shoes

▮ The construction designs and specifications for the wood stave pipe line below the dam on the Wallenpaupack project called for the installation of saddles eight feet apart along the pipe line and of eighteen pipe line bands and shoes between each pair of saddles. Through an error but sixteen bands and shoes were actually installed between each pair of saddles. Electric Bond and Share's engineers decided that the cost of correcting the error would not be justified by the additional margin of safety to be achieved. The unused bands and shoes were resold to the manufacturing company at a loss of $15,167.99. The loss was claimed as an element of cost but was disallowed by the Commission. The Commission's position is that to allow this item as a cost would be to require the government, if it takes over the project, to pay for a margin of safety not provided by the project as it was actually constructed by paying for materials never incorporated in the work. We agree with the Commission that the loss incurred upon the resale of these unused bands and shoes was not an element of actual cost of the project. They had no

---

5 Section 4(a) of the Federal Water Power Act, 41 Stat. 1065, prior to the 1935 amendment, read: "In order to aid the commission in determining the net investment of a licensee in any project, the licensee shall, upon oath, within a reasonable period of time, to be fixed by the commission, after the construction of the original project or any addition thereto or betterment thereof, file with the commission, in such detail as the commission may require, a statement in duplicate showing the actual legitimate cost of construction of such project, addition, or betterment, and the price paid for water rights, rights of way, lands, or interest in lands. * * *"

more to do with the completed work than if they had been used on another project or had never left the factory. This was not a case of excess material being supplied to cover the possibility of breakage, spoilage or similar contingency and afterward found not to be needed. These materials should have been used in the project but were omitted from it and they, therefore, have no place in its cost.

*Accounting Disposition of Amounts Disallowed*

■ The jurisdiction of the Commission to enter the order directing that the licensee remove from project accounts and transfer to the earned surplus account the items which the Commission disallowed is attacked by the licensee. It contends that the Federal Water Power Act, under which the license was granted, did not entrust the Commission with control of the licensee's capital accounts but merely of the project accounts and that even as to project accounts final determination of project cost or net investment was entrusted by the original act to the district court rather than to the Commission. It asserts that the 1935 amendment to section 14 of the act, which did give the Commission the right to determine net investment, could not affect its right under the original act to have this determination made by agreement or court decree. Finally it contends that the order of the Commission directing the disallowed items to be removed from the project accounts was, in effect, a final determination of the issue of net investment in violation of its right.

■ We see no merit in these contentions. Four federal courts of appeals have sustained the authority of the Commission to require items of project costs which it has disallowed to be written off to surplus under circumstances similar to those here disclosed. Northern States Power Co. v. Federal Power Commission, 7 Cir.,1941, 118 F.2d 141; Alabama Power Co. v. Federal Power Commission, 1942, 75 U.S.App. D.C. 315, 128 F.2d 280, certiorari denied 317 U.S. 652, 63 S.Ct. 48; Louisville Gas & Electric Co. v. Federal Power Commission, 6 Cir., 1942, 129 F.2d 126, certiorari denied 318 U.S. 761, 63 S.Ct. 559; Alabama Power Co. v. Federal Power Commission, 5 Cir., 1943, 134 F.2d 602. Those cases are clear authority for the Commission's order here complained of. We deem it unnecessary to add to their discussion of these questions other than to point out that the licensee had no vested right to have its investment determined by one procedure rather than by another at least so long as it was accorded a right to be heard and an ultimate judicial review. Accordingly the change of procedure which the 1935 amendment brought about did not, as applied to the present proceeding, violate the Fifth Amendment. Crane v. Hahlo, 1922, 258 U.S. 142, 42 S.Ct. 214, 66 L.Ed. 514. Compare Gibbes v. Zimmerman, 1933, 290 U.S. 326, 332, 54 S.Ct. 140, 78 L.Ed. 342; National Labor Relations Board v. Mackay Co., 304 U.S. 333, 351, 58 S.Ct. 904, 82 L.Ed. 1381.

■ Likewise we find no merit in the licensee's further contention that it was not afforded a sufficient notice that the question of the removal of the disallowed items from its accounts would be considered by the Commission or a sufficient opportunity to be heard thereon. As to this we need only quote what was said by Justice Miller in one of the Alabama Power Company cases (128 F.2d 280, 288): "Not only is it clearly apparent, therefore, that the Commission had full power to require accounting disposition of all items here in dispute, but it seems inescapable that accounting disposition of all was at issue from the very beginning of the proceedings here under review. Unless accounting disposition had been contemplated for the purposes of the statute, the inquiry would have been without meaning. The Company received its license with full knowledge that the law required it to cooperate with the Commission to the ends therein stated. It is impossible to read the statute without realizing the necessity of ascertaining and making accounting disposition of all items which the licensee put in issue. The grant of a license, being a privilege from the sovereign, can be justified only on the theory of resulting benefit to the public. The act, therefore, should receive a practical construction,—one enabling the Commission to perform facilely the duties required of it by Congress.' Every step in the proceedings and in the negotiations taken by the Commission has been for the purpose of establishing an accounting basis upon which it could perform its duties with respect to the licensee and to the public. This is precisely that regulation which is contemplated by the Act."

The order of the Federal Power Commission is affirmed.