**AMERICAN POWER & LIGHT CO. et al.**
**v. SECURITIES AND EXCHANGE**
**COMMISSION.**

No. 3966.

Circuit Court of Appeals, First Circuit.

Dec. 9, 1946.

Before MAHONEY, GOODRICH, (by special assignment), and WOODBURY, Circuit Judges.

R. A. Henderson, of New York City, Will M. Preston, of Miami, Fla., Reid & Priest, of New York City, and Loftin, Anderson, Scott, McCarthy & Preston, of Miami, Fla., for petitioners.

Robert S. Rubin, Asst. Sol., David Ferber, Sp. Counsel, Roger S. Foster, Sol., Harry G. Slater, Counsel, Public Utilities Division, and Melvin G. Dakin, all of Philadelphia, Pa., for S. E. C.

MAHONEY, Circuit Judge.

This case comes before us on the petition of American Power and Light Company for review, pursuant to § 24(a) of the Public Utility Holding Company Act of 1935, 49 Stat. 834, 15 U.S.C.A. § 79x(a) 1940, of certain accounting portions of the Securities and Exchange Commission orders dated December 28, 1943 and January 12, 1944. Florida Power and Light Company, a wholly owned operating subsidiary of American, whose accounts were

the subject of the above mentioned orders, likewise filed a petition for review pursuant to § 24(a) of the Act in the United States Circuit Court of Appeals for the Fifth Circuit, which petition has by stipulation and order of that Court been transferred here and consolidated with American's petition for review.

The Commission on July 10, 1941 instituted proceedings under §§ 11(b) (2), 12 (b), (c) and (f) and 15(f) of the Act, 15 U.S.C. §§ 79k(b) (2), 79l(b), (c), (f), 79o(f) (1940) against Florida Power and Light Company, American Power and Light Company and Electric Bond and Share Company, raising certain questions including the necessity of · a restatement of certain of Florida's accounts. A statement of the background and history of these companies as gathered from the record and briefs is necessary for an understanding of the issues herein involved.

Florida Power and Light is a public utility operating company incorporated in the State of Florida and engaged in wholly intrastate generation and distribution of electric energy. All of Florida's common stock is owned by American. The senior securities of Florida are publicly held and have unlisted trading privileges on one or more national exchanges registered under the Securities Exchange Act of 1934, 15 U.S.C.A. § 78ee.

American Power and Light Company, a Maine corporation, is exclusively a holding company in the Electric Bond and Share system, controlling directly or indirectly thirty-five subsidiaries, of which sixteen are public utility companies. American is registered with the Commission under the Public Utility Holding Company Act of 1935, and its dissolution has been ordered by the Commission and affirmed by this court. American Power & Light Co. v. Securities and Exchange Commission, 1 Cir., 1944, 141 F.2d 606, certiorari granted, 1945, 325 U.S. 846, 65 S.Ct. 1400, 89 L.Ed. 1968, reargued October 14, 1946, affirmed November 25, 1946, 67 S.Ct. 133. Of American's securities, Electric owns approximately twenty per cent of the total voting power; the remainder is listed and traded on national securities exchanges registered with the Commission. It is undisputed that Electric controls American and such control pervades the entire subholding company system. See American Power & Light Co. v. Securities Exchange Commission, supra, 141 F.2d at page 615. Electric Bond and Share Company, likewise a registered public utility holding company, is at the apex of the largest public utility holding company system registered under the Act. Electric's securities are widely distributed and enjoy unlisted trading privileges similar to that of Florida's senior securities.

One other company in the Bond and Share system need be mentioned—Phoenix Utility Company, a Connecticut construction corporation, all of whose stock (20 shares of $100 par value each) is owned by Electric Bond and Share. Company.

Prior to Florida's incorporation, American, during the years 1924 and 1925 in the midst of the historic Florida real estate boom, acquired securities and properties of numerous small local public utility companies. It was the theory of Electric and American that the expected increasing demand for utility service could best be served by a modern and integrated system. In the winter of 1925-26, American caused Florida to be created and transferred to it the securities and properties so acquired. Subsequently, during the period of 1926 to 1943, Florida had constructed property additions and had purchased additional utility properties. Out of this series of transactions arise the accounting questions now in dispute.

In the proceeding below the Commission raised issues as to the existence of substantial write-ups in the plant account of Florida; the adequacy of its depreciation reserve; the necessity for stopping dividends on preferred and common stocks held by American and interest on the debentures owned by American; the existence of an unfair and inequitable distribution of voting power among Florida's various classes of securities and security holders; the steps necessary to cure such inequities, if found to exist, including subordination to publicly-held securities of American's holdings of Florida's preferred stock and debentures; and the treatment to be accorded certain sums received by

American from Florida on or about July 1, 1941 as dividends on preferred stocks.

By way of partial answer to the matters complained of by the Commission, Florida and American filed joint declarations and applications, with subsequent amendments thereto, seeking approval of proposals for recapitalization and refinancing of Florida, involving among other things, surrender by American to Florida of certain of Florida's securities held by American and public sale of certain new securities. By order of the Commission these applications were consolidated for hearing with the aforesaid proceedings which had been instituted by the Commission.

On December 28, 1943 the Commission issued its findings, opinion and order in the consolidated hearings in which it approved the proposals for refinancing and recapitalization. This refinancing and recapitalization was necessary to accommodate certain accounting changes ordered by the Commission, as a means of eliminating known system write-ups occasioned by the transfer to Florida by American of utility properties and securities at prices substantially in excess of cost to American. No dispute now exists as to the propriety of these accounting orders and other charge-offs as ordered by the Commission in paragraph (1) of its order.

However, when the Commission came to consider the other issues raised by its notice of hearing it found that further accounting changes, those now questioned by petitioner, were also necessary as a result of the acquisition by Florida of utility properties by purchase from American and others and by construction.

### Account 100.5 Items.

The Commission found that not only did American transfer to Florida utility properties and securities at an excess over cost to it, but that acquisition cost to American and uninflated cost to Florida, after the write-up above mentioned had been eliminated, exceeded the original cost of these properties by $5,617,103.[1] Moreover, ac-

quisition cost to Florida of properties subsequently acquired exceeded original cost by $4,881,014.[1] These amounts aggregated $10,498,117. This amount the Commission found properly includible in Account 100.5 of the Uniform System of Accounts, since it represented the difference between arm's length cost to Florida and original cost (i. e. cost to the first utility devoting these properties to public service). Florida and American do not dispute the classification of this amount in Account 100.5 but object, however, to the disposition of the account as ordered by the Commission. Since Florida had not as yet completed its original cost study as ordered by the Commission under Rule U-27, the Commission felt that the exact amounts includible in Account 100.5 were still in doubt and that therefore no final definitive classification in or disposition of the account should be ordered. It, however, found that these items consisted either of tangibles or intangibles, but that for the purposes of the present proceeding it was unnecessary to determine whether the amounts represented payment for tangible or intangible items.

"In either event we are compelled to the conclusion that conservative accounting would have required that it be disposed of in whole or in part by this time. As an intangible it would represent what is variously termed good-will or going concern value, and as such should have been amortized over a relatively brief period of years. * * *

"As a tangible the item should of course have been depreciated and retired along with other elements of property cost and over the course of the 17 to 20 years that the bulk of these items have been in the plant account a very large portion of it would have been disposed of. In fact in view of the age of the properties acquired, some of which were far from new even at the date of acquisition, it is quite probable that a substantial portion of the property to which these items attached has been retired. In this event a substantial portion of the items rather than being amounts properly to be classified in Ac-

---

[1] Florida had stipulated before the Commission that it was not then prepared to dispute the items comprising these amounts.

count 100.5 are instead merely unrecorded retirements. Since the company has kept the items in its accounts undepreciated, unretired and unamortized, it is clear that action to dispose of them is not only due but overdue."

Although pending completion of the original cost study the Commission declined to take final action with respect to classification or disposition, because present indications are that approximately $10,500,000 will have to be disposed of, the Commission stated that "conservative accounting requires that the the company should begin now to make provision for such disposition."

It therefore ordered that: "(4) * * * pending final determination of the amount and disposition to be made of Account 100.5 items presently in the plant account of Florida, Florida shall annually beginning with the calendar year 1944 appropriate out of earned surplus to a contingency reserve at least $700,000, such act of appropriation to be without prejudice, however, to respondents' right to contest the validity of any definitive order with respect to such items as may ultimately be issued."

### Account 107 Items.

Electric Bond and Share even prior to the organization of Florida contemplated integration of the former utilities in the hands of Florida and to that end Florida in subsequent years constructed interconnections and additional generating facilities. Phoenix Utility Company, wholly owned by Electric, was utilized for the construction work of Florida and its predecessors. The Commission found that Phoenix received a construction fee of 4 per cent of the cost, aggregating $1,561,165, and on the basis of the present record held that this sum represented a pure intra-system profit and not legitimate items of costs. Support for this conclusion was found in Pennsylvania Power & Light Co. v. Federal Power Commission, 3 Cir., 1943, 139 F.2d 445, where the Third Circuit approved a similar finding by the Federal Power Commission in relation to another subholding company and licensee water power utility in the Bond and Share System. In that case Electric owned 15 per cent of the voting securities of the subholding company, which wholly owned the operating licensee utility. In both that case and the one before us the Commissions found that Phoenix had no separate existence apart from Electric other than its name. It did not have construction equipment, offices, officers or employees other than those supplied by Electric. None of its contracts were obtained by competitive bidding but solely through the good offices of its parent. In the present case below it was found that Electric through its control of American controlled Florida. The Commission thereupon ordered that the amounts of these fees, which had been capitalized as part of construction cost in the asset account, be classified in Account 107 of the Uniform System of Accounts and be disposed of by a charge to earned surplus.

In connection with this construction work, fees were also paid by Florida directly to Electric for engineering services rendered by Electric. These engineering fees were based upon salaries paid by Electric to its employees rendering these services as well as a stated percentage to cover overhead costs. In the Pennsylvania Power and Light Company proceedings, the Federal Power Commission determined that the overhead charged averaged 95 per cent of the salaries charged and that this was an inflated item since Electric had loaded the engineering department with expenses of other departments without justification. The Power Commission allowed only 50 per cent of salaries as a proper overhead charge. The Securities and Exchange Commission, on the basis of an independent examination of the testimony before it and evidence before the Power Commission, made a part of the present record, concluded that it had to agree with the findings of the Power Commission. Accordingly, it decided that overhead costs in excess of 50 per cent of direct salary costs were improperly capitalized items and as such constituted a profit paid to an affiliate. Such excess was found to equal $254,490 and was ordered classified in Account 107 and eliminated by a charge to earned surplus.

Both items aggregate $1,815,655 and have been considered as one item. The Commission therefore ordered that: "(2) * * * Florida Power & Light Company shall classify in Account 107 and eliminate from the Plant Account by charge to earned surplus not later than December 31, 1944, an amount of $1,815,- 655 consisting of capitalized intra-system profits paid to affiliated companies as construction and engineering fees."

It is these orders issued by the Securities and Exchange Commission pursuant to §§ 15(f) and 20(a) of the Public Utility Holding Company Act, 15 U.S.C.A. §§ 79o(f), 79t(a), that are now under attack on the merits. In a previous proceeding it was decided that American had standing to petition for review as a party aggrieved within the meaning of § 24(a) of that Act, 15 U.S.C.A. § 79x(a). American Power & Light Co. v. Securities and Exchange Commission, 1945, 325 U.S. 385, 65 S.Ct. 1254, 89 L.Ed. 1683.

Paragraphs (2) and (4) were made separable from the remaining portions of the order in order to permit judicial review and "shall not be deemed conditions to the granting of the applications and the effectiveness of the declarations with respect to the transactions proposed by applicants-declarants which are approved * * *."

Petitioner's objections to the orders under review may be briefly summarized as follows: the orders are beyond the powers of the Commission as conferred by the Public Utility Holding Company Act of 1935; the pertinent sections of the Act, §§ 15(f) and 20(a), are unconstitutional; and the action of the Commission is arbitrary and capricious in that the order is not warranted by the findings, the findings are not supported by sufficient evidence, and the orders are contrary to generally accepted accounting principles. The various subordinate questions raised by these objections will be brought out in the course of our discussion.

Since Florida, an intrastate public utility, is a subsidiary of American, a registered public utility holding company, the Commission has statutory authority to prescribe the form of Florida's accounts. Section 15(a) of the Act provides: "Every registered holding company and every subsidiary company thereof shall make, keep, and preserve for such periods, such accounts, cost-accounting procedures, correspondence, memoranda, papers, books, and other records as the Commission deems necessary or appropriate in the public interest or for the protection of investors or consumers or for the enforcement of the provisions of this title or the rules, regulations, or orders thereunder."

And the Commission has further statutory authority to examine the accounts kept or required to be kept and to order modifications to be made therein by virtue of § 15(f) which provides: "All accounts, cost-accounting procedures, correspondence, memoranda, papers, books, and other records kept or required to be kept by persons subject to any provisions of this section shall be subject at any time and from time to time to such reasonable periodic, special, and other examinations by the Commission, or any member or representative thereof, as the Commission may prescribe. The Commission, after notice and opportunity for hearing, may prescribe the account or accounts in which particular outlays, receipts, and other transactions shall be entered, charged, or credited and the manner in which such entry, charge, or credit shall be made, and may require an entry to be modified or supplemented so as properly to show the cost of any asset or any other cost."

By § 20(a) [2] the Commission was empowered to issue rules and regulations prescribing among other things " * * *

---

[2] "Section 20(a). The Commission shall have authority from time to time to make, issue, amend, and rescind such rules and regulations and such orders as it may deem necessary or appropriate to carry out the provisions of this title, including rules and regulations defining accounting, technical, and trade terms used in this title. Among other things, the Commission shall have authority, for the purposes of this title, to prescribe the form or forms in which information required in any statement, declaration, application, report, or other document filed with the Commission shall be set forth, the items or details to be shown

the methods to be followed in the keeping of accounts and cost-accounting procedures * * *".

■■ Under and by virtue of these sections of the Act, the Commission promulgated Rule U-27 requiring that "(a) Every registered holding company, and subsidiary thereof, which is a public-utility company and which is not required by either the Federal Power Commission or a State Commission to conform to a classification of accounts, shall keep its accounts insofar as it is an electric utility company in the manner currently prescribed for similar companies by the Federal Power Commission * * * except any company whose public utility activities are so limited that the application to it of such system of accounts is clearly inappropriate * * *." As mentioned previously, Florida is a subsidiary of a registered holding company and since its electric activities are intrastate it does not come within the jurisdiction of the Federal Power Commission. Nor is there any state regulatory body in the State of Florida which prescribes a system of accounts. Consequently Florida is obliged to keep its accounts in accordance with the Uniform System of Accounts. Justification for the application to subsidiaries of the accounting requirements of the Act and Rule U-27 may be found in Section 1 of this Act, 15 U.S.C.A. § 79a, where Congress determined that these companies are affected with a national public interest since their securities and the securities of their parents are widely marketed by means of the mails and instrumentalities of interstate commerce. This national public interest, the interest of investors in the securities of holding companies and their subsidiary companies, and the interest of consumers may be adversely affected:

"Sec. 1(b) (1) when such investors cannot obtain the information necessary to appraise the financial position or earning power of the issuers, because of the absence of uniform standard accounts; * * * when such securities are issued upon the basis of fictitious or unsound asset values having no fair relation to the sums invested in or the earning capacity of the properties and upon the basis of paper profits from inter-company transactions * * *;

"(2) when subsidiary public-utility companies are subjected to excessive charges for services, construction work, equipment, and materials, or enter into transactions in which evils result from an absence of arm's-length bargaining or from restraint of free and independent competition; * * *

"(5) when in any other respect there is * * * lack of effective public regulation * * *."

In order, therefore, to insure investors a proper appraisal basis for subsidiary securities the Commission was given the power to regulate accounting practices.

■■ The petitioner objects, however, that the orders now in question have no present relationship to the financing as approved by the Commission and that accounting jurisdiction is exercisable only in conjunction with other regulatory functions of the Commission. But accounting jurisdiction in this case was exercised in conjunction with the requested approval of proposed issues of securities. Although the accounting orders were severed by the Commission from the remaining portions of the order and not made conditions to the granting of the financing applications, it would seem that this was done for the

---

in balance sheets, profit and loss statements, and surplus accounts, the manner in which the cost of all assets, whenever determinable, shall be shown in regard to such statements, declarations, applications, reports, and other documents filed with the Commission, or accounts required to be kept by the rules, regulations, or orders of the Commission, and the methods to be followed in the keeping of accounts and cost-accounting procedures and the preparation of reports, in the segregation and allocation of costs, in the determination of liabilities, in the determination of depreciation and depletion, in the differentiation of recurring and nonrecurring income, in the differentiation of investment and operating income, and in the keeping or preparation, where the Commission deems it necessary or appropriate, of separate or consolidated balance sheets or profit and loss statements for any companies in the same holding-company system."

benefit of petitioner in securing judicial review thereof and that the safeguarding of prospective investors' interests required the accounting adjustments. Moreover, the Act contemplated Commission jurisdiction to make accounting adjustments for the protection of present investors of previously issued securities of both subsidiaries and holding companies in order that they may on the basis of approved accounts be better able to decide whether to hold or sell these securities and to enable prospective purchasers of these securities to determine whether they should purchase and at what price. As pointed out above, the securities of Florida, other than the American held common, and the securities of American enjoy trading privileges on national exchanges registered with the Commission. It would seem, therefore, that the accounting provisions of §§ 15 and 20 were intended to be applied entirely apart from the other regulatory provisions of the Act. See Sen.Rep. 621, 74th Cong. 1st Sess. (1935), p. 39.

 Despite the fact that Florida is an intrastate utility, its securities as well as those of its parent utilize the channels of interstate commerce. Congress has constitutional authority to regulate those who use the channels of interstate commerce as the means of spreading an evil and Congress can attack such an evil at its source. The source in this case is the accounts of Florida; the evil is sufficiently set forth in § 1 of the Act, supra. We think that the constitutionality of the regulatory power given to the Commission is supported by the reasoning and decisions of the Supreme Court in Electric Bond & Share Co. v. Securities and Exchange Commission, 1938, 303 U.S. 419, 58 S.Ct. 678, 82 L.Ed. 936, 115 A.L.R. 105 and North American Co. v. Securities and Exchange Commission, 1946, 327 U.S. 686, 66 S.Ct. 785. Since this argument was not strenuously urged upon us, we do not believe that it merits further discussion.

### Account 100.5 Items.

 The legislative authority found in §§ 15(f) and 20(a) for the regulation by the Commission of the accounting methods of registered holding companies and their subsidiaries is sufficient sanction for the adoption by the Commission in Rule U-27 of the Uniform System of Accounts. The petitioner objects, however, to the adoption of an "original cost" system as being without warrant in the statute. Section 20(a) empowers the Commission to prescribe: " * * * the manner in which the cost of all assets, whenever determinable, shall be shown * * * " and " * * * the methods to be followed in * * * the segregation and allocation of costs * * * " and in § 15(f): " * * * the manner in which such entry, charge, or credit shall be made, and may require an entry to be modified or supplemented so as properly to show the cost of any asset or any other cost."

This terminology seems to us to constitute such a broad grant of accounting power with respect to costs as to permit the adoption by the Commission of "original cost." Such general language as contrasted with the specific denomination of "original cost" in § 19a(b) of the Interstate Commerce Act, 37 Stat. 701 (1913) as amended, 49 U.S.C.A. § 19a(b) (1940); in § 208(b) of Part II of the Federal Power Act, 49 Stat. 853 (1935), 16 U.S.C.A. § 824g(b) (1940) and in § 213(c) of the Federal Communications Act, 48 Stat. 1074 (1934), 47 U.S.C.A. § 213(c) (1940) may be said to have been necessitated by the fact that in the Public Utility Holding Company Act the accounts of operating companies are dealt with only insofar as they are subsidiaries of holding companies, and the primary concern of the Act is holding companies in which "original cost" is of little importance. At any rate, the Commission by § 15(a) is empowered to prescribe whatever system it "deems necessary or appropriate in the public interest or for the protection of investors or consumers." We are not now in a position to say that "original cost" accounting is neither necessary nor appropriate nor at such odds with fundamental principles of accounting as intrinsically to manifest an abuse of power. Kansas City Southern R. Co. v. United States, 1913, 231 U.S. 423, 444, 34 S.Ct. 125, 58 L.Ed. 296, 52 L.R.A., N.S., 1.

■ Under the Uniform System of Accounts, Florida is obliged to record in Account 100.1 the "original cost" of its property and in Account 100.5 the difference between such "original cost" and acquisition cost. The text of Account 100.5, paragraph (c), provides: "The amounts recorded in this account with respect to each property acquisition shall be depreciated, amortized, or otherwise disposed of, as the Commission may approve or direct." This accounting scheme has been held valid by the Supreme Court in American Tel. & Tel. Co. v. United States, 1936, 299 U.S. 232, 57 S.Ct. 170, 81 L.Ed. 142 where Account 100.4 in the Telephone System of Accounts corresponds to Account 100.5 now in question. The court interpreted and the Commission there stipulated that amounts classified in Account 100.4 would not be arbitrarily written off, but that such amounts " * * * deemed, after a fair consideration of all the circumstances, to represent an investment which the accounting company has made in assets of continuing value will be retained in that account until such assets cease to exist or are retired * * *." At page 241 of 299 U.S. at page 174 of 57 S.Ct. On this basis the order prescribing the adoption of the uniform system was upheld despite objections similar to those urged here. The court distinguished New York Edison Co. v. Maltbie, 1935, 244 App.Div. 685, 281 N.Y. S. 223, affirmed, 1936, 271 N.Y. 103, 2 N.E.2d 277 where the excess over original cost was placed in an account "Suspense to be Amortized". The rules of the New York Public Service Commission contained an inflexible requirement that this account would be written off whether the value therein recorded was genuine or not. Consequently the New York courts held that such a system of accounts was arbitrary and confiscatory and hence invalid. The Federal Communications Commission System of Accounts did not contain this mandatory direction of a write off but rather only such amounts classified in the Acquisition Adjustment Account 100.4 "will be written off as appears, upon an application for appropriate directions, to be a fictitious or paper increment." American Tel. & Tel. Co. v. United States, supra, at page 240 of 299 U.S., at page 174 of 57 S.Ct.

The petitioner would have us place this case within the rule of the New York Edison case. However, here there is no compulsion in the System of Accounts that the Securities and Exchange Commission arbitrarily write off items included in Account 100.5. Nor has the Commission so acted. No disposition has as yet been ordered, no recordation of unsustained losses has been ordered, and the Commission has stated in its findings that " * * * the company should be afforded an opportunity to complete its study and to have that study reviewed by us before we take definitive action either with respect to classification in the appropriate account or with respect to a formal program of disposition." Holding Company Act Release No. 4791 (Dec. 28, 1943) p. 26.

Neither is the case precisely within the four corners of the American Tel. & Tel. Co. case where a finding of lack of value must precede a write off order of the Commission. See United States v. New York Telephone Co., 1946, 326 U.S. 638, 653, 66 S.Ct. 393; Northwestern Electric Co. v. Federal Power Commission, 1944, 321 U.S. 119, 121, 64 S.Ct. 451, 88 L.Ed. 596; Pacific Power & Light Co. v. Federal Power Commission, 9 Cir., 1944, 141 F.2d 602, 605; Northern States Power Co. v. Federal Power Commission, 7 Cir., 1941, 118 F.2d 141, 144. But here no ultimate disposition has been ordered, consequently definitive findings were unnecessary. The Commission, however, did make preliminary findings as indicated above concerning the composition of Account 100.5. A final order supported by definitive findings was impossible in view of the non-completion of Florida's original cost study as required by Rule U-27. We think the findings as made were sufficiently within the spirit of the doctrine of the American Tel. & Tel. case to support the order requiring a contingency reserve to be accumulated to offset probable write offs of the amounts eventually to be classified in Account 100.5. The present findings indicate that a substantial portion if not the entire account may be found by the Commission to be of such a character as to

necessitate a write off. Upon the completion of the original cost study the Commission will then hold a hearing and make findings and an order in compliance with the holding of the Supreme Court.

The petitioner likewise alleges that the findings as made are insufficient to indicate the probable necessity of a write off. The Commission found that the Account 100.5 items may be intangibles representing good-will or going concern value and as such should have been amortized over a relatively brief period of years, or tangible property which should have been depreciated and retired along with other elements of property cost when such property was retired. American contrasts these findings with the findings in other cases where judicially approved write offs had been ordered. The Northwestern Electric Co. v. United States, supra, involved capital stock issued neither for money nor property; that is, the stock was watered at issuance. This inflated value was classified in Account 107 and ordered written off. Little similarity exists between the facts of that case and those of the present. The petitioner points to Pacific Power & Light Co. v. Federal Power Commission, 9 Cir., 1944, 141 F.2d 602 and California-Oregon Power Co. v. Federal Power Commission, 9 Cir., 1945, 150 F.2d 25, certiorari denied, 1946, 326 U.S. 781, 66 S.Ct. 336, as illustrating the proper type of findings to support a write off of Account 100.5. In the former case the facts are similar to the case under review. American Power and Light Company acquired small utility companies which it transferred to Pacific Power and Light upon organization. American owned all of Pacific's stock. The Federal Power Commission classified $2,741,-591.66 in Account 100.5 representing the excess of acquisition cost to American over original cost and ordered amortization to income over a ten year period commencing in 1942. The Commission's order was supported by findings that the amount so classified represented "payment for intangibles, such as goodwill, going value, nuisance value, and franchise and monopoly value, all of which were thought to be rooted in and associated with prospective earning power." 141 F.2d 602, at page 604.

While such a specific finding is not present herein, neither is a final disposition involved. However, the finding, that as an intangible Account 100.5 represents good will or going concern value which should have been amortized, warrants the probability that as in the Pacific case the Commission, upon completion by Florida of the original cost study, will find specifically that certain specific dollar value items are payments for intangibles such as good will, etc. Since a write off can be ordered on the basis of such a finding, certainly a contingency reserve can be required to meet such a probable write off. The California-Oregon Power case involved a similar finding and write off and was affirmed on the basis of the Pacific Power case. The petitioner seeks to distinguish the findings in these cases by a claim that Florida's Account 100.5 represents an increase in value arising out of integration and consolidation rather than capitalized prospective earning power. This distinction the Commission is alleged to have ignored. Whether this is a real distinction in fact we do not now decide. Nor is this the time to consider whether the Commission must recognize such value. That question must be reserved until a final definitive order is entered. The findings are sufficient to indicate probable disposition of the intangible items in Account 100.5.

With reference to the possible tangible items in the Account the petitioner cites Kansas City Southern R. Co. v. United States, 1913, 231 U.S. 423, 34 S.Ct. 125, 58 L.Ed. 296, 52 L.R.A.,N.S., 1, and United States v. New York Telephone Co., 1946, 326 U.S. 638, 66 S.Ct. 393, as indicating the proper type of finding to support a write off. In the Kansas City case, I.C.C. rules of accounting required the write off of the value of abandoned tracks replaced by an improved road in a different location as distinguished from the procedure prescribed for handling improvements on the original location. Petitioner there argued for the retention of the value of the abandoned trackage as a part of cost of progress. The court instead determined that the write off was justified in view of the instantaneous obsolescence of the old road. Granting that there is here no finding of

instantaneous obsolescence neither is there a final disposition ordered. Moreover the findings made indicate the probable nonexistence of some if not all of the tangibles represented by Account 100.5. The New York Telephone Co. case involved an affiliate profit classifiable under this system of accounts in Account 107 and hence will be of concern later. In contrast to the Kansas City case the petitioner seems to say that since it maintained a Property Retirement Reserve Account retired property has been charged off to this account, and that plant account now includes the value of new property acquisitions purchased to replace worn out and retired property. This is said to have applied likewise to that part of the asset costs which though representing tangibles are classifiable in Account 100.5. Even this statement is not clear since in the course of argument petitioner's counsel conceded that all of the excess over original cost still persisted in the accounts. Moreover the record indicates that only the original cost of property (and perhaps a small portion of amounts classifiable in Account 100.5) were retired by a charge off to the Property Retirement Reserve Account. We reiterate that the proper time for this argument will be at the later hearing. The findings are sufficient to indicate probable write off of at least part of the tangible items in Account 100.5. Nor are we impressed by petitioner's argument that the increased depreciation reserves and not a contingency reserve account should absorb a possible write off. The Commission determined the proper amount for the depreciation reserve on the assumption that other disposition was necessary for these items and that investor protection required the depreciation reserve as ordered aside from the disposition of Account 100.5[3]

■ Further objection is made that there is no evidentiary basis for the findings and hence no justification for the creation of a contingency reserve. Upon examination of the record we conclude that there was sufficient evidence to warrant the Commission findings. The property that American transferred to Florida was acquired during the height of the Florida real estate boom and the major portion of the subsequent purchases of Florida were made prior to 1930. This was an era of inflated values and speculation. Prices at that time reflected expectancies of continued "prosperity." Moreover it has been pointed out that " * * * public utility properties are necessarily bought and sold at prices reflecting the expectations of the buyers and sellers as to what the properties can be made to earn in the future." Bonbright, Original Cost as a Base Rate, 20 Accounting Review 441, 443 (1945).

On the other hand if Account 100.5 represents tangibles, it should be recognized that the evidence demonstrated that the property was purchased from 13 to 20 years prior to the order, and some of it was not then new. Furthermore, an additional 15 years reprieve has been granted to the utility before a write off will be ordered of property that will at least by then be worn out, obsolescent or retired. The record is so replete with evidence of this nature that we cannot say that the findings are not supported by substantial evidence.

■ Great emphasis is placed by the petitioner on the argument that the order imposes "such a measure of just plain bad accounting,—the kind that falsifies and does not reflect the facts,—that it is arbitrary and capricious." By this argument petitioner attacks the accounting validity of "original cost" accounting as being contrary to generally accepted business practices and sound accounting principles. We, therefore, look to the accounting authorities for support of the Commission's accounting requirements. Dr. Paton's article Accounting Polices of the Federal Power Commission—A Critique, 77 Journal of Accountancy 432 (1942) is cited. Paton says that classification of assets into Accounts 100.1 and 100.5 does not itself constitute an outright violation of the gen-

---

[3] The proper amount to be incorporated in the depreciation reserve did not seem to be based on an engineering study of the value and estimated life of depreciable property but rather on a percentage of tangible depreciable property other than Account 100.5 items.

eral accounting principle that accounts should be charged with actual cost to the buyer. He, however, criticizes the original cost provisions as having nothing to do with proper accounting procedures. But at page 439 he says: "Although it seems clear that any sweeping conclusion to the effect that account 100.5 in most cases represents nothing but the cost of intangibles is unwarranted, it is probably true that a considerable fraction of the total cost of properties which is included in 'adjustments' under the F.P.C. system does reflect intangibles at least under a broad definition of that term."

And again at page 459: "If the portion of actual cost which is charged to 100.5 is dealt with on the merits precisely as the portion of such cost charged to 100.1—and there is nothing in the system which prevents such treatment—there is nothing to complain about except inconvenience. Unfortunately the policy of the Commission * * * ' seems to be definitely directed toward a different treatment of the 'acquisition adjustment' from that accorded to the 'original cost' portion of the investment. A special feature of this policy, not supported by accounting, is the theory that all costs of intangibles are subject to rapid amortization." Accord: Dohr, Power Price Fixing, 79 Journal of Accountancy 432, 80 Journal of Accountancy 15, 111 (1945).

Evidently Dr. Paton objects to an arbitrary disposition of Account 100.5. Such is not the situation in this case. Professor Bonbright in Original Cost as a Rate Base, 20 Accounting Review 441 (1945) states at pp. 442, 443: "The argument for the acceptance of the later transfer price as a substitute for original cost is made to rest partly on assumed principles of orthodox accounting and partly on the ground that the rates of the present company should be regulated by reference to the costs incurred by the very company rather than by reference to the costs incurred by some previous company."

Professor Bonbright advocates therefore the disposition of excess over original cost, and in a posed situation where a new owner is compelled to pay more than original cost in order to accomplish integration and consolidation, a socially desirable objective, he concedes that the excess may be included in the rate base, subject, however, to amortization over a reasonable period of time. Mr. May in his book Financial Accounting (1943) considers this question quite frequently. Like Dr. Paton, he disputes the soundness of the Commission's theory on accounting principles but concedes that accountants, while not adopting the theory of mandatory write off of intangibles, recommend their early disappearance from the books. See page 153 et seq. A lively dispute exists among accountants in and out of the regulatory bodies as to the propriety of classification and amortization. Compare Bond, Accounting Policy or Economic Philosophy? 20 Accounting Review 24 (1945), and Carter, Some Issues Involved in "Original Cost" 20 Accounting Review 222 (1945) with Kohler, Development of Accounting for Regulatory Purposes of the Federal Power Commission, 14 George Washington Law Review 152 (1945) and Kripke, A Case Study in the Relationship of Law and Accounting: Uniform Accounts 100.5 and 107, 57 Harvard Law Review 433, 693 (1944). Our analysis of the above authorities leads us to the conclusion that the substance of the objections relates to arbitrary dispositions of Account 100.5 regardless of value. See Arkansas Power & Light Co., 55 P.U.R. (N.S.) 129 (Ark. Dept. of P.U.1944); Montana Power Co., 56 P.U.R. (N.S.) 193 (Mont. P.S.C.1944). Under the American Tel. & Tel. stipulation to which we have a right to expect the Commission to adhere, arbitrary disposition will not be ordered. The Commission likewise cites reputable authority for its position that by good accounting standards intangibles should be written off. See Sanders, Hatfield and Moore, A Statement of Accounting Principles (1938) p. 14; Paton and Littleton, An Introduction to Corporate Accounting Standards (1940) pp. 92, 93. And the testimony of expert accountants attached to the Commission staff should not be entirely discounted. See Pacific Power & Light Co. v. Federal Power Commission, supra, at page 605 of 141 F.2d. As long as the Commission has some sup-

port among accounting authorities, "* * * courts ought not to be called upon to interfere with or correct alleged errors with respect to accounting practice. If we were in disagreement with the Commission as to the wisdom and propriety of the order, we are without power to usurp its discretion and substitute our own." Norfolk & Western R. Co. v. United States, [1932], 287 U.S. 134, 141, 53 S.Ct. 52, 54, 77 L.Ed. 218. "What has been ordered must appear to be 'so entirely at odds with fundamental principles of correct accounting' (Kansas City Southern R. Co. v. United States, [1913], 231 U.S. 423, 444, 34 S.Ct. 125, 131, 58 L.Ed. 296, 52 L.R.A.,N.S., 1) as to be the expression of a whim rather than an exercise of judgment." American Tel. & Tel. Co. v. United States, 1936, 299 U.S. 232, 236, 57 S.Ct. 170, 81 L.Ed. 142.

We conclude, therefore, that the order of the Commission was proper. The necessity for the creation of a contingency reserve finds warrant in the record. The petitioner has objected to the freezing of earned surplus and the consequent inability to declare otherwise lawful dividends. The Commission has indicated its willingness to consider any alternative source on which a reserve may be drawn that Florida may suggest. Florida offered none and is foreclosed a protest at this stage of the proceedings. The State of Florida and not the S.E.C. has jurisdiction to decide what funds are available for dividends and what the rate base shall be. The argument that American as sole shareholder of Florida is thus being deprived of dividends may be answered by the argument that prior year dividends were undoubtedly enhanced by a failure to properly record whatever losses did occur. The effect of lack of dividends on the market value of Florida's shares which American will be forced to sell is too conjectural to be considered here.

■ It must be noted that we do not now hold that when a definitive order of disposition is entered the charge off must necessarily be made to income rather than to an operating expense account. Paragraph (4) of the order is stated to be without prejudice to Florida's right to contest the validity of any definitive order as

may be issued. Because no final disposition has been ordered, we are unable to find any merit in the argument that the due process clause of the Fifth Amendment has been violated by a taking of some $10,000,000 from the shareholders of Florida (i. e., American). The shareholder's equity in the Contingency Reserve Account remains as in any earned surplus from which dividends are not declared and upon a final order, what is not required for a write off will again be available to the shareholders as management should deem proper.

### Account 107 Items.

■ The statutory authority quoted above to support the Commission's adoption of the Uniform System of Accounts and the original cost provisions of that system likewise empowers the Commission to classify items of construction costs and engineering service fees. The Commission has here found that fees paid to the affiliate Phoenix and the parent Electric are properly classifiable in Account 107 since they represented pure profit and hence are not legitimate items of cost to be capitalized as part of Florida's plant account. It is argued by petitioner that while the "no profits to affiliates" rule may be proper in the water power licensee cases under Part I of the Federal Power Act since there the statute permits the recognition only of "actual legitimate original cost" (16 U.S.C.A. § 797(b) (1940), the mandatory elimination of such profits is neither necessary nor permissible under the Public Utility Holding Company Act.

We are not, however, convinced that this argument has the weight urged by petitioner. The "no profits to affiliates" rule has been applied with judicial approval to non-licensee electric utilities under Part II of the Federal Power Act, California-Oregon Power Co. v. Federal Power Commission, 9 Cir., 1945, 150 F.2d 25 certiorari denied, 1946, 326 U.S. 781, 66 S.Ct. 336, where the statute uses the phrase "actual legitimate costs." 16 U.S.C.A. § 824g(a) (1940). And recently the Supreme Court has sanctioned the application of the rule to telephone utilities under the Federal Communications Commission System of Accounts. United States v.

New York Telephone Co., 1946, 326 U.S. 638, 66 S.Ct. 393. The Communications Act authorizes the Commission to prescribe the form of accounts, and requires the carrier to file at the Commission's request for valuation purposes a statement showing "original cost". 16 U.S.C.A. § 213(c) (1940). The Public Utility Holding Company Act of 1935 likewise provides in §§ 15(a), (f) and 20(a) for Commission authority to prescribe the form of accounts and we pointed out above under our discussion of Account 100.5 that the absence of the phrase "original cost" was not determinative. Moreover, § 1(b) of the Holding Company Act points out the evils which the act seeks to alleviate:

"(1) * * * When such securities are issued upon the basis of fictitious or unsound asset values having no fair relation to the sums invested in or the earning capacity of the properties and upon the basis of paper profits from intercompany transactions * * *"

"(2) when subsidiary public-utility companies are subjected to excessive charges for services, construction work, equipment, and materials, or enter into transactions in which evils result from an absence of arm's-length bargaining * * *."

It is obvious that the elimination of these evils warrants the use of the "no profit to affiliates" rule by the Commission in the instant case and that its application is not limited necessarily to waterpower licensees. Consequently the Commission has authority to classify the fees in question in Account 107 and order disposition thereof.

■ The order is amply supported by the findings of the Commission and by the facts adduced in the record. We do not feel required to further augment this opinion by reiterating what has been so ably decided by the Court of Appeals for the Third Circuit in Pennsylvania Power & Light Co. v. Federal Power Commission, 3 Cir., 1943, 139 F.2d 445. See also: Puget Sound Power & Light Co. v. Federal Power Commission, 1943, 78 U.S.App.D.C. 143, 137 F.2d 701; Alabama Power Co. v. Federal Power Commission, 5 Cir., 1943, 134 F.2d 602; Alabama Power Co. v. McNinch, 1938, 68 App.D.C. 132, 94 F.2d 601. In the Pennsylvania case almost the identical factual situation and a similar order was involved as pointed out above. The record of the Power Commission in that case was made a part of the proceedings below and the findings and order here involved were substantially in accord with those approved by the Circuit Court of Appeals. Consideration was given to the question of the degree of affiliation and the court concluded that the close affinity of intercorporate relationship justified a finding eliminating such fees from legitimate cost. No question of the reasonableness of the fees involved need be considered when it is found that Electric so completely dominated Florida and Phoenix that, in fact if not in law, these companies became mere departments in one integrated system. 139 F.2d 445 at page 450. See American Power & Light Co. v. Securities and Exchange Commission, 1 Cir., 1944, 141 F.2d 606, 615.

■ Petitioner further objects that American as shareholder is being deprived of dividends out of earned surplus although it did not receive any benefit from the affiliate fees. The Commission answered that the earned surplus only exists because the fees in question were improperly capitalized when they should have been charged off through operating expenses when made. It stated that the charge off now is merely delayed recognition of this fact; and it may be assumed that prior earned surplus was inflated because operating expense was not charged at the time the fees were disbursed. It is our view that the charge off of illegitimate capital expenditures should rather have been made to a capital surplus account. Logically then this delayed write off should now be made to that account. Since the capital surplus, inflated because no such charge off had been made, is now nonexistent, having been used to absorb other write offs, we approve the write off to earned surplus for lack of another source. At any rate, we are not now concerned with the legality of a dividend declaration. Northwestern Electric Co. v. Federal Power Commission, 1944, 321 U.S. 119, 125, 64 S.Ct. 451, 88 L.Ed. 596.

Arguments concerning the possible variance between this result and accounting practices have been answered under Account 100.5 Items, supra. Likewise what was said about the various statutory and constitutional arguments is equally applicable here.

The orders of the Securities and Exchange Commission of December 28, 1943, and January 12, 1944, are affirmed.